**OVERSEAS MEDIA CORPORATION et al., Appellants,**

v.

**Robert S. McNAMARA, Secretary of Defense, Appellee.**

**No. 20590.**

United States Court of Appeals District of Columbia Circuit.

Argued April 3, 1967.

Decided Oct. 3, 1967.

---

Mrs. Betty Southard Murphy, Washington, D. C., with whom Mr. Warren Woods, Washington, D. C., was on the brief, for appellants.

Mr. John C. Eldridge, Atty., Dept. of Justice, with whom Messrs. David G. Bress, U. S. Atty., and Alan S. Rosenthal, Atty., Dept. of Justice, were on the brief, for appellee, Mr. Harvey L. Zuckman, Atty., Dept. of Justice, also entered an appearance for appellee.

Mr. Lawrence Speiser, Washington, D. C., filed a brief on behalf of American Civil Liberties, as *amicus curiae*, urging reversal.

Before FAHY,* McGOWAN and TAMM, Circuit Judges.

McGOWAN, Circuit Judge:

Appellants filed in the District Court an action for injunction and declaratory relief, requesting that certain actions and alleged failures to act on the part of appellee, the Secretary of Defense, be declared invalid on constitutional and other grounds. Specifically, the court was asked to order the Secretary to reverse a decision of the Department of Defense denying to appellants the use of certain newsstand facilities of military post exchanges in the Far East for the purpose of selling their newspapers. Appellants also sought a preliminary injunction.

* Circuit Judge Fahy became Senior Circuit Judge April 13, 1967.

Appellee moved for dismissal of the complaint or, in the alternative, for summary judgment. After hearing argument, the trial judge granted the latter; and this appeal followed. We reverse because we think the complaint tendered factual issues giving rise to a legally justiciable question, and that summary judgment was inappropriate in its foreclosure of consideration of the merits of appellants' allegations.

## I

The facts as recited hereinafter are founded upon allegations in the complaint and in various supporting documents and affidavits. Appellants are a publishing corporation and its chief executive officers. For the past sixteen years, Overseas Media Corporation has published in Europe *Overseas Weekly* and a companion weekly, *Overseas Family*. The readership of the papers has primarily been drawn from the ranks of American non-commissioned service personnel and their families. *Overseas Weekly* styles itself as "the acknowledged champion of the American G. I." and, as such, claims to have performed important services of the kind traditionally associated with the vigorous reporting of facts of public interest and concern which might otherwise have remained unrevealed.[1]

The weekly editions of the two papers have been distributed in Europe by *Stars and Stripes*, a military paper familiar to most servicemen, which holds concession rights for post exchange newsstands operated by the Army and Air Forces' European Exchange Service, and which receives a substantial commission for its services. With American activity in the Far East increasing dramatically in 1965, the distribution balance of servicemen began to shift, with more and more troops arriving in Viet Nam and smaller yet significant numbers departing from Europe for the former destination. That trend has not as yet reversed itself. In light of this shift, and because *Overseas Weekly* had "received numerous letters from individual servicemen and company commanders and officers in the field requesting distribution of Overseas Weekly in Viet Nam and the Pacific area," appellants decided to publish a Far East edition of this newspaper and to seek distribution facilities throughout the area.[2]

There appear to be three methods by which newspapers and periodicals are purchased for military newsstands in the Far East.[3] Some post exchanges actively manage their own newsstands, and place orders through the Army-Air Force Exchange in New York for those publications they desire. Other exchanges, while retaining the right to designate which publications are to be ordered, contract with *Stars and Stripes* to manage the newsstands. Finally, some local exchanges contract with privately owned distributing companies. Under this latter arrangement, the private company purchases the newspapers and periodical and delivers them to the exchange newsstands. Star Distributing Company of Okinawa, which publishes a weekly newspaper in competition with

---

1. One example alleged in this regard is the first public disclosure of the membership in the John Birch Society of the Commanding General of a United States Army Division in Germany.

2. In support of their request for a preliminary injunction, appellants claimed they were irreparably injured by the Secretary's decision. In support of this allegation, they offered proof that from January to July, 1966, "fifteen advertising accounts have decreased their advertising in Overseas Weekly in * * * amounts totalling approximately $107,-

000.00 due to the lack of a Pacific edition."

3. Because the decision below was made on a motion for summary judgment, we have not had the benefit of the full record normally provided by an evidentiary hearing. Many pertinent facts, particularly those relating to the precise methods of periodical distribution now employed in the Far East, are confused and controverted beyond exact understanding. We take as true, as we must for purposes of this appeal, the version of the facts advanced by the appellants.

*Overseas Weekly*, performs this function in South Viet Nam.[4] Star has been subsidized by the United States Government to the extent that its trans-Pacific shipping requirements are supplied by the Government.

Appellants decided to print a Far East edition of their paper in Hong Kong, or other similarly situated Asia city, and to send each weekly edition by commercial air freight to post exchange distribution centers throughout the area. To further this objective, they wrote, in March, 1965, to the Far East Exchange Service in Yokahama, Japan, seeking instructions on the approved procedure for obtaining rights to use military newsstands. For some months this request was channelled through a number of regional exchange offices. Finally, in August, 1965, the President of Star Distributing Company informed Overseas Media that, because of space limitations, "we do not wish to handle these [publications] on our newsstands" in Viet Nam.[5]

After further contacts with service exchange personnel had proven fruitless, appellants approached Mr. John C. Broger, Directorate of Armed Forces Information and Education, Office of the Secretary of Defense (Manpower). In sworn affidavits in the district court, appellants alleged that "we asked Mr. Broger what were the criteria or the formula for getting approval for distribution in the Far East through the Exchange System. He said, in effect, there were no criteria, but he would attempt to set up a committee to devise a formula which would enable publishers to learn how to go about getting approval." This

was not done; and appellants next arranged a conference with Mr. Thomas D. Morris, Assistant Secretary of Defense (Manpower), who affirmed that "there were no established criteria for obtaining distribution rights in the Far East and said he preferred to leave such decisions to the Post Exchanges themselves. He added, however, that if inaction on their part was tantamount to commercial discrimination or unfairness, he would intervene." On the advice of the Defense Department, appellants reapplied for distribution rights through the same channels they had previously attempted, only to be met again with similar rebuffs. Appellants further alleged, by way of affidavit in the district court, that over 30 additional publications were granted access to military newsstands in the Far East after *Overseas Weekly* was denied such access.

In view of their complete failure to win approval for Exchange distribution, and acting on a suggestion of the Defense Department, appellants next attempted to ascertain the feasibility of selling *Overseas Weekly* without benefit of competitive access to the military newstands. A special Far East edition of the paper was replated in Frankfurt and commercially airlifted to Saigon. Copies were hawked on the streets of the city, and the entire edition was soon sold out. Encouraged by this success, appellants asked the Defense Department, through Assistant Secretary Morris, to furnish them a "no objection letter," assertedly a *sine qua non* of the publication and distribution of newspapers in certain Far Eastern countries, without falling afoul of the ban

4. While the record is not clear, it appears that the military retains the power to designate what newspapers and periodicals may appear on its newsstands. Government counsel, both in brief and oral argument, vacillated in suggesting that (1) Star Distributing Company is responsible for the selection of newspapers and periodicals for distribution in Viet Nam and (2) the military makes its own decisions as to which publications will be handled. Assistant Secretary of Defense Morris appears to suggest that the military commanders control the selection

when he says that his refusal of *Overseas Weekly's* request was based on his personal confirmation of the view of local commanders "that there already existed a full assortment of publications and that distribution and sales facilities were saturated."

5. While appellants plan to distribute *Overseas Weekly* throughout the Pacific area, they regard distribution rights in Viet Nam as essential in view of the large concentration of American forces in that country.

or interference of the foreign governments involved. This request, together with a renewed request for Exchange distribution rights, was denied by Secretary Morris in a letter dated May 17, 1966. The pertinent paragraphs in that letter are these:

I have personally looked into this matter further with the Commander in Chief, Pacific, and his component commanders. I have also inspected Exchange facilities at a number of locations in South Vietnam and examined the range of publications and merchandise of all kinds carried by them. Based upon these discussions and examinations, I have concluded that it would not be advisable at this time to use military facilities for the distribution of your newspaper.

First, we have found that there is already a balanced selection of printed material being provided for sale. The Pacific Exchanges are supplied with both daily and weekly news publications, such as *Pacific Stars and Stripes,* and Pacific editions of *Time* and *Newsweek* magazines. Most installations also have their own newspapers. Moreover, local civilian newspapers and other local publications are usually available through Exchanges or on-base newsstands. Widespread use is made of daily news sheets compiled from material originating with the news wire services.

Second, we have verified the reports of the military commanders that only a selected list of publications can be distributed due to space limitations, and that our present distribution facilities have reached the point of saturation.

Thirdly, as pointed out by the Commander in Vietnam, "In consideration of the saturated condition of the aerial distribution system in-country, there appears to be no justification for changing or expanding the list of representative publications now on order by the Army-Air Force Exchange Service."

I have verified that the factors stated above have been applied in considering the products of other entrepreneurs. In fact, over 1,000 items have been deleted from the Vietnam Post Exchange inventory since December.

You stated that in order to engage in the distribution of your newspaper in the Saigon area without use of military facilities it would be necessary for this Department to provide you a letter expressing "no objection" before permission could be obtained from the Vietnamese authorities. Our reply was that we must maintain a policy of complete neutrality, since to set a precedent for one private entrepreneur would open the door for many such other requests.

I regret that my reply must, under the circumstances, be unfavorable.

After an invocation of the good offices of the Secretary of Defense resulted in a letter from his Acting General Counsel reaffirming the position of Secretary Morris, the appellants filed suit on July 25, 1966.

Appellants' complaint the prayer for relief of which is set out in the margin,[6]

---

6. "Wherefore, Plaintiffs pray the Court enter judgment as follows:

1. Declaring that the banning of the Overseas Weekly in the Pacific area violates the First Amendment and the due process clause of the Fifth Amendment to the Constitution of the United States.

2. Declaring that the act and purpose of the defendant, in the purported performance of his duties as Secretary of Defense, as hereinabove alleged, has violated and violates the First Amendment to the Constitution of the United States, and enjoining and restraining the defendant, his agents, servants and employees from continuing the said act.

3. Issuing a preliminary injunction and a permanent injunction enjoining the defendant, his successors and subordinates, from denying Overseas Weekly distribution facilities in the Pacific area, on the grounds that such denial is unconstitutional, and directing defendant to make distribution facilities in the Pacific area available to plaintiffs, on the same basis that such distribution facilities have been

reflected a broad-based challenge to the Secretary's action in excluding *Overseas Weekly* from access to Exchange facilities on grounds which appellants, on personal knowledge,[7] claimed were false and misleading. Appellee answered, defending on the alternate grounds that appellants had no standing to bring the action, and, in any event, controlling principles of law required the court to grant summary judgment to the Secretary as there were no material questions of fact in dispute.[8] After the trial judge suggested that, if anyone had standing to bring the action, the publishers of the newspapers surely did, the Government pressed only its request for summary judgment.

The court heard both parties at some length, and then delivered an oral opinion granting appellee's motion. Being of the view that "military authorities have full discretion to determine what items of merchandise to handle," the court reached the conclusion that

> the activity of which the plaintiff complains is not subject to judicial review. The issues of fact which are sought to be raised become immaterial. Under the circumstances the defendant's motion for summary judgment is granted and therefore, the plaintiffs' motion for a preliminary injunction becomes moot and is denied on that ground.

It thus appears that the grant of summary judgment was based upon the view that, no matter what facts might be proven, the court was without jurisdiction to grant any relief.

It thus appears to us that, at least upon this appeal, the multiple issues raised by the parties can be reduced to a single one, namely, does the Secretary of Defense, purportedly acting without reference to established criteria,[9] have

and are being made available to other publications.

4. Declaring that the banning of the Overseas Weekly from distribution facilities in the Pacific area was imposed without observance of procedural requirements and was arbitrary and capricious and hence was an abuse of discretion by the defendant.

5. For such other relief as this Honorable Court may deem necessary and appropriate."

7. The President of Overseas Media Corporation submitted an affidavit in opposition to the Government's motion for summary judgment in which she swore that (1) she had spent one month touring the proposed area of distribution in the Pacific and (2) based on her observations, she was able to reaffirm previous affidavits of the plaintiffs controverting the facts relied on by Secretary Morris in banning *Overseas Weekly*.

8. Pursuant to the local rules of the District Court, appellants submitted the following "statement setting forth material facts as to which it is contended there exists a genuine issue necessary to be litigated. * * *"

1. Whether the logistic pipeline in the entire Pacific is saturated and would be overtaxed if plaintiffs were given access to military newsstands from Hawaii to Thailand since plaintiffs will ship commercially.

2. Whether the military newsstands from Hawaii to Thailand have a "balanced selection" of reading material when defendant has banned the most popular military newspaper from the newsstands.

3. Whether the denial of access to the military newsstands has caused plaintiffs economic injury.

4. Whether the defendant has denied distribution facilities to plaintiffs in the entire Pacific area because of his personal suitability evaluation of the newspaper, instead of for the reasons given.

5. Whether plaintiffs could distribute in Vietnam and Thailand without the defendant's approval and grant of a "no objection" letter.

9. In an affidavit filed in the district court, Secretary Morris related that the individual armed services have regulations setting forth the criteria to be applied to determine the suitability of a publication for distribution but "[n]o evaluation of the suitability of the proposed Pacific edition of *Overseas Weekly* was made in view of the recommendation of the responsible area commanders against distribution of any additional newspapers at this time." Appellants, in brief to this court, profess to "have no quarrel" with these suitability requirements, and concede that "[t]his case would be entirely different if the Secretary of Defense had applied the published criteria to

power, insulated from judicial review, to deny to appellants access to post exchange newsstands in the Far East when it is alleged that he has granted such access to similarly situated publishers? The district judge answered this question in the affirmative. We cannot agree.

Appellee suggests that action of the Defense Department is totally insulated from judicial review because it falls into "[t]wo categories of governmental determinations which have traditionally been viewed as 'committed to agency discretion' and thus not judicially reviewable."[10] The two categories are (1) decisions with respect to the operation of the military establishment and (2) decisions regarding the procurement of merchandise, supplies or services for governmental use.

▮ With respect to this first category, we note that we deal here with a matter far removed from what is ordinarily subsumed under the head of military operations. It is—and must—be true that the Executive should be accorded wide and normally unassailable discretion with respect to the conduct of the national defense and the prosecution of national objectives through military means. The power of the armed services to make their dispositions of men and materiel, and to take measures for the safeguarding of each, does not admit of fragmentation.

▮ There is, however, only one aspect of the record before us which seems related to the conduct of military operations. This is the statement of Assistant Secretary Morris, which appears to be limited to Viet Nam, that "in consideration of the saturated condition of the aerial distribution system in-country, there appears to be no justification for changing or expanding the list of representative publications now on order by the Army-Air Force Exchange Service." If the military authorities bearing the awesome responsibilities of Viet Nam concluded that transport was needed for other things than newspapers, judicial scrutiny of such a determination might well be wholly unfeasible. But the allegation is that, after this statement was made, over 30 publications were added to the list of newspapers and periodicals available to the exchanges in Viet Nam. The allegation also is that appellants do not propose to use military transport in order to get their papers to Saigon; all they need to effect distribution there and in other countries of the Far East, without utilization of any military facilities whatsoever, is a "no objection" letter. Thus, in the light of these allegations—which may or may not prove to be true—it is impossible to say at this time that the necessities of military operations justify appellee's refusal to respond to appellants' requests.

▮ Appellee alternatively contends that his decision fell into the area of procurement, and that his discretion in the purchase of supplies is not subject to question.[11] We do not stop to

*Overseas Weekly* and then found the newspaper unsuitable." They then suggest that the action of the Secretary cannot be sustained in the absence of criteria for selection or rejection of periodicals found to be "suitable." It was apparently criteria of this last-mentioned kind which Mr. Broger contemplated formulating, but which purpose was never carried out.

10. Appellants submit that they are entitled to review the determination of the Secretary under the review provisions of the Administrative Procedure Act (5 U.S.C. §§ 701–706 (1966 revision)), and appellee counters with the argument that his action falls within the exception to the review provisions for "agency action * * * by law committed to agency discretion." Appellee does not assert that there is any further statutory preclusion of judicial review.

11. Appellee relies heavily on a statement by Mr. Justice Black, in Perkins v. Lukens Steel Co., 310 U.S. 113, 127, 60 S.Ct. 869, 876, 84 L.Ed. 1108 (1940), that "[l]ike private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases."

pursue the implication of the assertion on behalf of appellee that newspapers are no different from any other article of merchandise subject to military procurement. Whether they are or not, the publishers of newspapers, like the makers of shoe polish, may fairly claim to be governed by uniform standards.[12]

In *Lukens Steel* the plaintiffs attacked a wage determination made by the Secretary of Labor pursuant to an Act of Congress applicable to the entire steel industry. The Court suggested that the sole purpose of the Act was to benefit the Government, and that plaintiffs did not have a litigable interest which would allow them to "enforce the responsibility" of the Secretary "or to represent the public's interest in the Secretary's compliance with the Act." 310 U.S. at 129, 60 S.Ct. at 877. The court was quick to point out, however, that this "contested action of the * * * officials did not invade private rights in a manner amounting to a tortious violation." *Ibid.* The Court further limited its holding in the final paragraph of its opinion:

Our decision that the complaining companies lack standing to sue does not rest upon a mere formality. We rest it upon reasons deeply rooted in the constitutional divisions of authority in our system of Government and the impropriety of judicial interpretations of law *at the instance of those who show no more than a mere possible injury to the public.*

310 U.S. at 132, 60 S.Ct. at 879 (Emphasis added.) Appellants here show far more than "a mere possible injury to the public." They allegedly have suffered grave financial losses in the past few years and continue to do so. They do not attack a broad governmental decision applicable to an entire industry, but a ruling applicable to them alone which prevents their publishing *Overseas Weekly* in an area where a not insignificant number of their proven readers are residing. While we do not here suggest that the readers of appellants' newspaper have an enforceable interest in receiving the paper, we do suggest that appellee reads *Lukens Steel* too broadly. We note also in passing that Mr. Justice Black wrote *Lukens Steel* long before the Administrative Procedure Act, and its review provisions, were enacted into law.

12. While we decline the invitation of appellants and the *amicus* to base our ruling on the broad constitutional grounds of the First and Fifth Amendments— issues which are more wisely resolved after trial than before—constitutional overtones tend to permeate any situation where suppression or interference with publication is alleged. See Dombrowski

v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); New York Times v. Sullivan, 376 U.S. 254, 275, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Smith v. People of State of California, 361 U.S. 147, 152–153, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959). The perils involved in trifling with either the right of the publisher to disseminate or the right of the soldier to read have not been lost on appellee:

Senator THURMOND. Mr. Secretary, if you were making the decision as to whether the issues of the Overseas Weekly, which I have just handed to you, should go with the Stars and Stripes for the men serving overseas, what would your decision be?

Secretary MCNAMARA. I would say (a) I would not buy it as a periodical and as a private individual; (b) I would not recommend that it be bought by any associate of mine or any subordinate of mine; (c) I would recommend specifically that they not buy it; (d) I am not exactly certain what I would do specifically if you asked me if I would take steps to prevent its distribution.

This is a serious problem. It relates to the freedom of the press. That is one of the things we stand for.

There are far worse periodicals than this being distributed today in the United States that your children, my children, are all exposed to.

I always wonder whether we should not be setting higher standards both as they relate to the distribution of printed matter and as they relate to the distribution of matter over the air, but it is a difficult question and I would want to think long and hard before I took the action to prohibit the distribution of this material and to make impossible the acceptance of it by troops or other citizens of this country.

Senator THURMOND. Mr. Secretary, the question is not whether you would try to prohibit the sale of it and prohibit free speech. The question is if you were making the decision today as to whether our servicemen overseas should have this paper, this sexy, malicious, low paper sent with the Stars and Stripes to our servicemen, whether or not you would permit it if you were making that decision today.

Secretary MCNAMARA. I do not believe that it is sent with the Stars and Stripes to the servicemen. I believe it is made

Apart from the questions in this regard raised by the allegations, there is a more fundamental issue as to whether procurement in the usual sense is involved here. The record, as we have indicated above, is in such an unclear state that we cannot confidently characterize the precise nature of the arrangements under which newspapers are marketed in service installations in the Far East. There is certainly some suggestion that the Armed Services do not, at least in every case, buy newspapers for resale, which is the way appellee keeps restating the procurement point in his brief. We think that a proper resolution of this issue requires the illumination of an evidentiary hearing. While appellee may very well prove successful in sustaining his decision as to appellants,[13] we cannot accept his contention that the District Court is powerless to inquire into a possible abuse of discretion.[14]

available for purchase by them, and the question would be should its availability for purchase be eliminated, and I am—frankly, I cannot answer the question. It is an extremely difficult question.

I would wish the counsel of my General Counsel, and the counsel of others in the Department before I made the final answer.

\*　　\*　　\*　　\*　　\*

Senator THURMOND. Do you or not have the power as Secretary of Defense to discontinue assuming responsibility for the distribution of this Overseas Weekly even if Stars and Stripes is getting 40 percent or $100,000 a year, as I understand they are getting?

Secretary MCNAMARA. I believe that as a practical matter, whether as a legal matter I cannot say for sure, but as a practical matter I believe I have the power to make it very difficult for one of the members of the Armed Forces to obtain that paper at the same point of distribution at which they obtain Stars and Stripes.

Senator THURMOND. You have taken no steps, of course, to try to prevent freedom of speech, and properly so. But aren't you assisting in the distribution of this putrid material when you allow the Stars and Stripes to distribute this paper along with the official Stars and Stripes for which the taxpayers of this country pay?

Secretary MCNAMARA. No, sir; I do not believe I am assisting in its distribution. As I implied by the answer to your previous question, I think that I should be asking myself as I have, and as you are now, whether I should not utilize all the power I have available to me to put roadblocks in the way of its distribution.

I have been asking myself that question. The paper is distributed in the European theater, and it has taken me some time to obtain the information on which I may base an answer.

The information I have so far from the commanders concerned, four-star generals, two or three of them, plus subordinates of theirs, and the recommendations they have made all point to a continuation of the present policy.

I must say I find it a little difficult personally to accept that recommendation. I have not accepted it finally. The matter is still under consideration.

The points you raise are very valid points. There are, from my point of view, even more serious charges that may be made against it in terms of accuracy of reporting and appropriateness of editorial comment.

But these matters are still under consideration and, as I say, they involve some of our basic freedoms. The issues are very complex, and I want to be certain that I have considered them fully and properly before making a final decision.

Hearings before the Committee on Armed Services of the U. S. Senate on S. Res. 191, 87th Cong., 1st Sess. 45, 46 (1961).

13. We think it important to emphasize that we are not dealing here with a defense on the part of the Government that the Secretary of Defense has barred *Overseas Weekly* from military newsstands through the application of general criteria to which all other publishers are subject. Rather the Government says only that its newsstands are filled, its transportation capabilities are overtaxed, and a balanced selection of publications is available. Appellants allege that the newsstands are not filled, they do not intend to rely on Government transportation, and over 30 publications were given the access they sought after the date of its denial to them.

14. Appellee apparently would have us adopt the view that the act of committing a matter to an agency's discretion forecloses court consideration of an alleged abuse of that discretion. The Legislative

■ We have recently had occasion to consider the amenability to judicial inquiry of a determination within the Executive Branch affecting procurement. Gonzalez v. Freeman, 118 U.S. App.D.C. 180, 334 F.2d 570 (1964). There, where Gonzalez protested his exclusion from participation in bidding for certain contracts of the Commodity Credit Corporation, and the Government defended on the ground that the blacklisting was action committed to agency discretion and therefore unreviewable, Judge Burger, speaking for the court, said:

Thus to say that there is no "right" to government contracts does not resolve the question of justiciability. Of course there is no such *right;* but that cannot mean that the government can act arbitrarily, either substantively or procedurally, against a person or that such person is not entitled to challenge the processes and the evidence before he is officially declared ineligible for government contracts. An allegation of facts which reveal an absence of legal authority or basic fairness in the method of imposing debarment presents a justiciable controversy in our view. The injury to appellants alleged that their complaint gives them standing to challenge the debarment processes by which such injury was imposed. See Copper Plumbing & Heating Co. v. Campbell, 110 U.S.App.D.C. 177, 179–180, 290 F.2d 368, 370–371 (1961).

118 U.S.App.D.C. at 184–85, 334 F.2d at 574–75.[15]

History of the Administrative Procedure Act belies this position:

Mr. Donnell. [Senator from Missouri.] I should like to ask the distinguished Senator a question. * * *

It has occurred to me that the contention might be made by someone in undertaking to analyze this measure that in any case in which discretion is committed to an agency, there can be no Judicial Review of action taken by the agency. The point to which I request the Senator to direct his attention is this:

In a case in which a person interested asserts that, although, the agency does have a discretion vested in it by law, nevertheless there has been abuse of that discretion, is there any intention on the part of the framers of this bill to preclude a person who claims abuse of discretion from the right to have Judicial Review of the action so taken by the agency?

Mr. McCarran. [Senator from Nevada.] Mr. President, let me say, in answer to the able Senator that the thought uppermost in presenting this bill is that where an agency without authority or by caprice makes the decision, then it is subject to review.

* * * * *

Mr. Donnell. But the mere fact that a statute may vest discretion in an agency is not intended, by this bill, to preclude a party in interest from having a review in the event he claims that there has been an abuse of that discretion. Is that correct?

Mr. McCarran. It must not be an arbitrary discretion. It must be a Judicial discretion; it must be a discretion based on sound reasoning.

Mr. Donnell. I thank the Senator. Legislative History of the Administrative Procedure Act, Senate Doc.No. 248, 79th Cong., 2d Sess. 310–11 (1946).

15. As it does here, the Government, in *Gonzalez*, vigorously urged that the action of debarment by Secretary Freeman was "agency action by law committed to agency discretion" and therefore unreviewable. Judge Burger disposed of that argument in language we think most appropriate here:

The determination to debar a contractor does not fall within the scope of the second exception, "agency action * * * by law committed to agency discretion." * * * Appellants here do not challenge broad policy decisions, as in the *Lukens Steel* and *Pauling* cases, *supra*, but narrowly attack as beyond agency authority a debarment or "blacklisting" which the complaint alleges inflicted a special injury on appellants and was accomplished in a procedurally unfair and unauthorized manner. * * *

The invasion of a legally protected right also constitutes a legal wrong under the meaning of "legal wrong" as used in Section 10(a) of the Administrative Procedure Act. We have already demonstrated that appellants have a right not to be debarred except in an authorized and procedurally fair manner; appellants' allegations of the

Although there are factual distinctions to be made between *Gonzalez* and appellants' case, and the Government makes all of them, we find them to be distinctions without a meaningful difference. We choose to follow the rationale of *Gonzalez;* and, while we intimate no opinion as to the ultimate merit of appellants' claim for relief, we do conclude that they are entitled to have that claim considered by the District Court after the facts have been established by evidence in an adversary hearing. Accordingly, the grant of summary judgment below is reversed, and the case remanded for further proceedings not inconsistent herewith.

It is so ordered.

means by which debarment was imposed in this case set forth a claim of invasion of that right and give them standing under Section 10(a). * * * We read Section 10(b) of the Administrative Procedure Act * * * as providing that whenever judicial review is not "specified by statute" or is inadequate "any applicable form of legal action (including actions for declaratory judgments or writs of * * * injunction * * *)" may be brought "in any court of competent jurisdiction."

This specifically authorizes the type of action brought by appellants in the District Court. Finally, although this is not agency action for which Congress has specifically provided judicial review, debarment here is "final agency action for which there is no other adequate remedy in any court * * *" under Section 10(c). Section 10(c) thus contemplates judicial review under the terms of Section 10(e). 118 U.S.App.D.C. at 185–86, 334 F.2d at 575–576. (Footnotes omitted.)