**CONSTRUCTORES CIVILES de CEN-TROAMERICA, S. A. (CONCICA),**
Appellant,

v.

**John HANNAH et al.**

No. 24357.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 3, 1971.

Decided March 14, 1972.

Mr. Roger M. Dougherty, Washington, D. C., with whom Miss Frances Clark Barrie, Messrs. James M. O'Neill and Francis T. O'Donnell, Washington, D. C., were on the brief, for appellant.

Mr. Philip L. Cohan, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, John A. Terry and Miss Mary E. Folliard, Asst. U. S. Attys., were on the brief, for appellees. Mr. Leonard W. Belter, Asst. U. S. Atty., also entered an appearance for appellees.

Before WRIGHT, TAMM and ROBINSON, Circuit Judges.

TAMM, Circuit Judge:

In this case we are once again confronted with questions of standing, sovereign immunity and preclusion of judicial review in relation to government contracts. Appellant, Constructores Civiles De Centroamerica, S. A. (hereinafter "CONCICA"), a Honduran corporation, filed a complaint in the District Court seeking a mandatory injunction and declaratory judgment against appellees, the Administrator, and several subordinate officials of the Agency for International Development (hereinafter "AID"). Accompanying the complaint were motions for a temporary restraining order and a preliminary injunction. Upon denial of these motions, an appeal was lodged with this court which was eventually dismissed on appellant's motion. Thereafter appellees filed in the District Court a motion to dismiss the complaint for lack of jurisdiction and for failure to state a claim upon which relief could be granted. Appellees' motion was granted, whereupon this appeal was noted. Several issues were raised in the motion to dismiss including standing, sovereign immunity and preclusion of judicial review. Unfortunately, we are unable to determine the precise basis for the decision below, the dismissal being rendered sans opinion or findings. Since the complaint was dismissed as a matter of law for insufficiency under Fed.R. Civ.P. 12 we must view the allegations therein in the light most favorable to CONCICA.

## I. Facts

On January 23, 1968, the United States, acting through AID, as authorized by the Foreign Assistance Act of 1961, 22 U.S.C. § 2151 et seq. (1970), entered into a loan agreement with the Central American Bank for Economic Integration (hereinafter "CABEI"), a development bank and intermediate credit institution. The purpose of the loan was to stimulate the economic independence of the peoples of Latin America in furtherance of the Alliance for Progress. The loan agreement specified that the loan was to be used to continue CABEI's program of making subloans to member countries of the Central American common market to finance the cost of infrastructure projects, primarily in the public sector, such as road construction. Under the terms of the loan, AID and CABEI were to jointly approve contracts and contractors.[1]

---

1. The pertinent paragraphs of the loan agreement are:

Article IV. Section 4.01(b)

The Borrower shall see to it that Sub-Borrowers financed hereunder at all times employ suitably qualified engineering and other technical services (which shall be provided by consultants except as A.I.D. may otherwise agree in writing) to assume professional responsibility for the design and execution of the Sub-Projects.

Article VI, Section 6.05

Contracts and Contractors. A.I.D. and Borrower will agree on the procedures for the review and approval of contracts and contractors financed hereunder.

In accordance with the aforementioned loan agreement the government of Nicaragua obtained financing from CABEI for certain capital development projects and invited bids for construction of the "Rama Road" Project, the lowest of which was from appellant.[2] The local government and AID officials found CONCICA a qualified bidder,[3] however, AID/Washington did not, on the ground that CONCICA failed to meet the specific AID requirement that the firm have had experience on similar projects.

CONCICA alleges two errors on appeal. First, it asserts that AID/Washington used improper standards in determining whether CONCICA was a qualified bidder. Second, appellant urges that AID's disqualification from the "Rama Road" Project and oral declaration of disqualification for future projects constitutes actual blacklisting or *de facto* debarment which necessitates a hearing.

## II. *Standing*

■ In Ballerina Pen Co. v. Kunzig, 140 U.S.App.D.C. 98, 433 F.2d 1204 (1970), cert. denied, National Industries for Blind v. Ballerina Pen Co., 401 U.S. 950, 91 S.Ct. 1186, 28 L.Ed.2d 234 (1971), we indicated that a party has standing to challenge the government's award of a contract in the absence of specific "person aggrieved" language in the statute under which the contract was formed if a three-part test is satisfied.

First, the party must allege that the challenged action has caused him injury in fact, in order to satisfy the Article III requirement that he possess "the personal stake and interest that impart the concrete adverseness" necessary to the existence of a case or controversy. Barlow v. Collins, *supra,* 397 U.S. 159 at 164, 90 S.Ct. [832] at

836 [25 L.Ed.2d 192]; *cf.* Ass'n of Data Processing Service Organizations v. Camp, *supra,* 397 U.S. at 150, 90 S.Ct. 827 [25 L.Ed.2d 184]. The plaintiff must further allege that the agency has acted arbitrarily, capriciously, or in excess of its statutory authority, so as to injure an interest that "is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 153, 90 S.Ct. at 830; *cf.* Barlow v. Collins, *supra,* 397 U.S. at 164, 90 S.Ct. at 836. Finally, there must be no "clear and convincing" indication of a legislative intent to withhold judicial review. *See generally Scanwell Laboratories* [v. Shaffer], *supra* (137 U.S.App.D.C. [371] at 381, 387, 424 F.2d [859] at 869, 875 n. 10, 19).

140 U.S.App.D.C. at 101, 433 F.2d at 1207 (footnotes omitted).[4] Application of these criteria to the case at bar compels the conclusion that appellant has standing to challenge the instant agency action.

## A. *Injury in Fact*

■ The first requirement of standing is clearly satisfied by appellant, an unsuccessful bidder on a $2.9 million contract, allegedly barred from participation in future capital development projects in Central-America financed by AID. As we indicated in Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970)

If there is arbitrary or capricious action on the part of any contracting official, who is going to complain about it, if not the party denied a contract as a result of the alleged illegal activity?

137 U.S.App.D.C. at 378–379, 424 F.2d at 866–867.

---

2. Appellant's bid was $200,000 lower than that of the next lowest bidder.

3. CONCICA had been found qualified by the regional AID office, the country AID mission in Nicaragua, CABEI, the bond-

ing company, the consulting engineer, and the Government of Nicaragua.

4. Preclusion of judicial review is discussed in Part V, *infra.*

## B. *Allegations of Arbitrary, Capricious or Illegal Agency Action*

The second criterion of standing is equally met by appellant. Citing "arbitrary, capricious and illegal" action (Appellant's Brief at 15), CONCICA alleges that "AID/Washington without authority, in contradiction to their own published rules and regulations, and without due process of law has denied CONCICA from engaging in the very activities for which it was formed." (Appellant's Brief at 8.) We shall briefly set forth the arguments on the two issues raised by appellant without a foray into the merits of the dispute since we need not reach such determinations in the present posture of the case.

AID found CONCICA unqualified when measured against the standard set forth in the "Capital Projects Guidelines" (hereinafter "Guidelines") published by AID.[5] The "Guidelines" provide "[t]hat qualifying experience must be the experience of the firm itself and not merely of individuals."[6] A.I.D. Capital Projects Guidelines § 2.24(ii). Since CONCICA was a newly formed corporation without any previous construction contract awards, it was disqualified by AID. CONCICA, however, argues that the "Guidelines" do not apply since CABEI is an intermediate cred-

it institution specifically exempted from the coverage of the "Guidelines," citing § 1.5 of the "Guidelines" which provides that "[t]hese guidelines do not apply to procurement of goods and services financed by loans made to or with respect to development banks or other intermediate credit institutions. . . ."

AID responds that under § 1.7 of the "Guidelines" it is expressly provided that individual contract and implementing letters must be consulted in determining the rules governing a specific loan agreement. "Accordingly, paragraph IV(B) [7] . . . of Implementation Letter No. 1 dated January 23, 1968, which provides for joint approval of contractors, and paragraph VI(A),[8] which incorporates the Capital Projects Guidelines, are controlling." (Appellee's Brief at 5). Furthermore, AID insists that § 1.5 merely precludes automatic application of the "Guidelines," but does not prevent the parties from independently adopting the "Guidelines" as they allegedly did in paragraph VI(A) of Implementation Letter No. 1.

The second claim of error raised on appeal is that the action of AID in disqualifying CONCICA and AID's oral declaration of disqualification for future projects is actual blacklisting or *de facto* debarment [9] which requires a hear-

---

5. The "Guidelines" have been construed as merely permissive by the General Accounting Office. Comp.Gen.Dec.B–164676 (March 7, 1969).
 For a discussion of the function of the Comptroller General see Wheelabrator Corp. v. Chafee, 147 U.S.App.D.C. 238, 455 F.2d 1306 (Oct. 14, 1971); United States ex rel. Brookfield Const. Co. v. Stewart, 234 F.Supp. 94, 99–100 (D.D.C. 1964); John Reiner & Co. v. United States, 325 F.2d 438, 440, 163 Ct.Cl. 381, 386 (1963). *See also* Cibinic & Lasken, The Comptroller General and Government Contracts, 38 Geo.Wash.L.Rev. 349 (1970).

6. Two members of the three-man firm have civil engineering degrees, with accompanying certificates and licenses. The third has completed three of four years in a civil engineering curriculum. These individuals have a combined experience in al-

legedly comparable work of approximately 60 years.

7. Paragraph IV(B) of Implementation Letter No. 1 provides:
 I wish to confirm our understanding that concurrence by CABEI and ROCAP [Regional AID mission] is necessary concerning contractors, plans, specifications, contracts and substantive changes, thereto.

8. Paragraph VI(A) of Implementation Letter No. 1, provides:
 Confirming recent discussions it is our understanding that the general principles and specific rules of the Capital Projects Guideline (Attachment E) applicable to this loan will be defined in early CABEI/ROCAP meetings and confirmed in a subsequent Implementation Letter.

9. *See generally* Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570 (1964).

ing under the Code of Federal Regulations.[10] AID's response is that since CONCICA has never been awarded a construction contract, commenced operations, nor found more than contingently qualified pending final determination by AID/Washington, it could not possibly have been debarred. Transcript at 23, 25, 27, 28.

We express no comments upon the merits or viability of these contentions, but only indicate that CONCICA should at least have an opportunity to present them. Should they appear insubstantial, the District Court can of course enter summary judgment in accordance with the principles espoused in Blackhawk Heating & Plumbing Co. v. Driver, 140 U.S.App.D.C. 31, 433 F.2d 1137 (1970).

C. *Arguably within the Zone of Interests . . .*

Although the Supreme Court's requirement of injury to an interest "arguably within the zone of interests to be protected or regulated" has been the subject of much critical comment,[11] and some of our decisions indicate that injury in fact alone may suffice to establish stand-

ing,[12] we note that under either standard appellant must prevail.

In order to divine the Congressional intent we must examine the statutory indicia as mandated by the Supreme Court in Barlow v. Collins, 397 U.S. 159, 167, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) (Brennan, J., concurring and dissenting).

> Congressional intent that a particular plaintiff have review may be found either in express statutory language granting it to the plaintiff's class, or, in the absence of such express language, in statutory indicia from which a right to review may be inferred. Where, as in the instant cases, there is no express grant of review, reviewability has ordinarily been inferred from evidence that Congress intended the plaintiff's class to be a beneficiary of the statute under which the plaintiff raises his claim.

397 U.S. at 174, 90 S.Ct. at 842 (footnotes omitted).

The Congressional statement of policy for the Foreign Assistance Act provides:

> The Congress further declares that to achieve the objectives of this chapter, programs authorized by this chap-

10. Appellant alleges that he is protected by 41 C.F.R. § 1–1.604–1 (1971), which provides:

(a) *Initiation of debarment action.* An agency seeking to debar a concern or individual (or any affiliate thereof) for cause shall furnish that party with a written notice: (1) stating that debarment is being considered, (2) setting forth the reasons for the proposed debarment, and (3) indicating that such party will be accorded an opportunity for a hearing if he so requests within a stated period of time.

(b) *Hearings.* An opportunity for a hearing conducted in a manner prescribed by agency regulations shall be accorded to any concern or individual which the agency proposes to debar. Such regulations shall establish procedural safeguards which satisfy the demands of fairness, and which, at a minimum, shall provide that information in opposition to the proposed action may be presented, in person or in writing, and, if desired, through an appropriate representative. However, where one

agency has imposed debarment upon a concern or individual, a second agency may also impose a similar debarment for a concurrent period without according an opportunity for a hearing provided that the second agency furnishes notice of the proposed similar debarment to that party, and accords that party an opportunity to present information in his behalf to explain why the proposed similar debarment should not be imposed in whole or in part.

11. *E. g.,* Barlow v. Collins, 397 U.S. 159, 167, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) (Brennan, J., concurring and dissenting) ; K. Davis, Administrative Law Treatise, § 22.00 et seq. (Supp.1970).

12. *See* Ballerina Pen Co. v. Kunzig, 140 U.S.App.D.C. 98, 110, 433 F.2d 1204, 1216 (1970) ; Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 384, 424 F.2d 859, 872 (1970). *But see* Curran v. Laird, 136 U.S.App.D.C. 280, 296, 420 F.2d 122, 138 (1969) (Wright, J., dissenting) (*en banc*).

ter should be carried out in accordance with the following principles:

. . . [A]ssistance shall be furnished in such a manner as to promote efficiency and economy in operations so that the United States obtains maximum possible effectiveness for each dollar spent.

22 U.S.C. § 2151.

Furthermore, in recognition of the unique relationship among the peoples of Latin America and our own country the Congress asserted the following:

It is the sense of the Congress that the historic, economic, political, and geographic relationships among the American peoples and the Republics are unique and of special significance and that the Alliance for Progress offers great hope for the advancement of the welfare of the peoples of the Americas and the strengthening of the relationships among them. *It is further the sense of Congress that vigorous measures by the countries and areas of Latin America to mobilize their own resources for economic development and to adopt reform measures to spread the benefits of economic progress among the people are essential to the success of the Alliance for Progress and to continued significant United States assistance thereunder.*

22 U.S.C. § 2211(a) (emphasis added).

 These broadly stroked provisions obviously do not specify particular individuals or groups to be served by the loan assistance program. The statute speaks to socio-economic interests of the peoples of Latin America. However, the requirement for standing is only that the asserted interest be arguably within the zone of interests sought to be protected. Certainly the economy of a country is dependent upon the stability of local business enterprises such as CONCICA. Suffice it to say that the challenging party need only show that it is an intended beneficiary of the statute not necessarily the primary one. Peoples v. United States Department of Agriculture, 138

U.S.App.D.C. 291, 293, 427 F.2d 561, 563 (1970); Curran v. Laird, 136 U.S.App. D.C. 280, 284, 420 F.2d 122, 126 (1969) (*en banc*). "Evidence that [appellant's] class is a statutory beneficiary . . . need not be as strong for the purpose of obtaining review as for the purpose of establishing [appellant's] claim on the merits. Under *Abbott Laboratories* [Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681], slight beneficiary indicia will suffice to establish his right to have review and thus to reach the merits." Barlow v. Collins, *supra*, 397 U.S. at 175–176, 90 S.Ct. at 843 (Brennan, J., concurring and dissenting).

### III. *Non-Resident Alien Status*

AID seeks to place this case outside the ambit of the Administrative Procedure Act and the *Scanwell-Ballerina Pen-Blackhawk* trilogy on the ground that AID is not a direct party to the contract and that CONCICA is merely a nonresident alien. We must therefore undertake a brief survey of the law of standing as it relates to non-resident aliens.

In immigration disputes non-resident aliens have generally been denied standing on the ground that the statute evinced such an intent. See Braude v. Wirtz, 350 F.2d 702 (9th Cir. 1965). *See generally* C. Gordon & H. Rosenfield, 2 Immigration Law & Procedure § 8.3 (Rev.Ed. 1971). However, this general rule has been subject to some exception where courts have invoked the remedial purposes of the immigration laws and the hospitable treatment they mandate upon questions of reviewability to justify their conclusions. See Rusk v. Cort, 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962); Shaughnessy v. Pedreiro, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955); Estrada v. Ahrens, 296 F.2d 690 (5th Cir. 1961).

In petitions for writs of habeas corpus non-resident alien parties have been similarly excluded from the doors of the courthouse. *E. g.* Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94

L.Ed. 1255 (1950).[13] These decisions, however, shed little light upon our present inquiry since by the very nature of the proceeding the presence of the person deprived of liberty is essential to the court's jurisdiction. *See* Kokoris v. Johnson, 195 F.2d 518, 519 (4th Cir. 1952).

There are, however, a series of decisions which hold that non-resident aliens may maintain suit where the court has a *res* within its jurisdiction. Foreign non-resident corporations have thus been granted standing to sue under some circumstances. *See* Cia Mexicana De Gas, S. A. v. Federal Power Comm., 167 F.2d 804 (5th Cir. 1958). *See also* W. Fletcher, 18 Cyclopedia of Corporations § 8606 (1969). In The Disconto Gesellschaft v. Umbreit, 208 U.S. 570, 28 S.Ct. 337, 52 L.Ed. 625 (1908), the Court permitted suit where it had jurisdiction over assets of an insolvent debtor which it refused to allow the foreign claimant to remove. Similarly in Russian Volunteer Fleet v. United States, 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473 (1931), the Supreme Court permitted a foreign corporation to challenge governmental action where contracts for ships under construction in American yards were within the court's jurisdiction. Ten years ago, over the vigorous dissent of Chief Judge Bazelon, this court, while noting the trend away from the rigid requirements of standing, felt that under the then present state of the law, it must deny standing to a Canadian corporation challenging its appearance on the "Canadian Restricted List" of the Securities and Exchange Commission. Kukatush Mining Corp. v. Securities & Exchange Comm., 114 U.S. App.D.C. 27, 309 F.2d 647 (1962). The list was a public statement by the Commission of the names of Canadian corporations whose securities the Commission

had reason to believe were being, or may have been distributed in the United States in violation of certain registration requirements. The corporation transacted no business and had no assets in the United States.

Does any harmony arise out of this cacophony of decisional law which can guide us in the resolution of the instant matter? We note initially that a person may be just as "affected or aggrieved" by agency action within the terms of the Administrative Procedure Act if he is a non-resident alien as if he were a resident alien. Furthermore, the Administrative Procedure Act uses the words "any person" not "any citizen." [14] Nevertheless, non-residency may be important and relevant in many contexts. It depends upon the circumstances. We must however proceed with caution for the Supreme Court has indicated that "[a]lien citizens, by the policy and practice of the courts of this country, are ordinarily permitted to resort to the courts for the redress of wrongs and the protection of their rights." *Disconto Gesellschaft, supra,* 208 U.S. at 578, 28 S.Ct. at 339.

■ We note that in the matter at bar unlike the immigration cases there is no indication that Congress intended to limit review or entrust the matter to the finality of the administrative process. " 'Exemptions from the . . . Administrative Procedure Act are not lightly to be presumed,' . . . and unless made by clear language or supersedure the expanded mode of review granted by that Act cannot be modified." Brownell v. Tom We Shung, 352 U.S. 180, 185, 77 S.Ct. 252, 256, 1 L.Ed.2d 225 (1956). There is also little likelihood of a flood of litigation or dilatory tactics in the instant genre of cases. *Compare* Braude v. Wirtz, *supra,* 350 F.2d at 705.[15] Fur-

---

13. Citing Johnson v. Eisentrager, *supra,* we have denied standing to non-resident aliens who have not alleged specific threatened injury in challenging the detonation of a nuclear device. Pauling v. McElroy, 107 U.S.App.D.C. 372, 278 F.2d 252 (1960).

14. "[P]erson" includes an individual, partnership, corporation, association, or pub-

lic or private organization other than an agency.
5 U.S.C. § 551(2) (1970).

15. Should such problems arise summary judgment, of course, may be a useful tool. *See* Blackhawk Heating & Plumbing Co. v. Driver, 140 U.S.App.D.C. 31, 433 F.2d 1137 (1970).

thermore, we note that although AID is not strictly speaking a party to the contract, there are sufficient, substantial contacts with AID/Washington. The contract does not come into existence until AID/Washington approves of its terms and parties. Moreover, continuing consultation is required between AID, CABEI and sub-borrowers. Furthermore, the money, the essence of the entire Loan Assistance Program under the Alliance for Progress, and without which CABEI and Nicaragua could not participate in these self-help programs, originates from the United States Treasury in Washington. The status of appellant is also noteworthy. Unlike appellant in *Kukatush*, CONCICA is not an alleged evildoer. Quite to the contrary, CONCICA brings this suit not only on behalf of itself under a statute at least arguably enacted for its own benefit, but also for the American people as a private attorney general. *See* Scanwell Laboratories, Inc. v. Shaffer, *supra*, and cases cited therein. If the allegations are substantiated, the people of this country will be spared an unnecessary $200,000 expenditure. The coalescence of these factors leads us to conclude that CONCICA, despite its status as a non-resident alien corporation, has standing to maintain suit.

### IV. *Sovereign Immunity*

■ We may dispense with appellees' assertion that sovereign immunity is a bar to the instant suit by citing Estrada v. Ahrens, *supra*, 296 F.2d at 698 where the court commented as follows:

> By providing judicial review in an action brought by "any person adversely affected or aggrieved by any agency action" Congress permitted suits which under established tests would certainly be barred as suits against the government. . . . *The Act thereby makes a clear waiver of sovereign immunity in actions to which it applies.* (Emphasis added).

We have similarly upheld this waiver of sovereign immunity in *Scanwell* wherein we stated:

> It seems axiomatic to us that one must imply, from a statement by the Congress that judicial review of agency action will be granted, an intention on the part of Congress to waive the right of sovereign immunity; any other construction would make the review provisions illusory.

137 U.S.App.D.C. at 386, 424 F.2d at 874.

### V. *Preclusion of Judicial Review*

The provisions of the Administrative Procedure Act authorizing judicial review apply "except to the extent that— (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a) (1970).[16] Appellee contends that the agency action challenged herein is peculiarly and exclusively entrusted to the discretion of the Executive both by the very nature of the subject matter and by the statute itself, and, as such is not reviewable. *See generally* K. Davis, 4 Administrative Law Treatise § 28.16 (1958).

We wholeheartedly concur in appellees' observation that the judiciary must tread warily in the field of foreign affairs or national security. For in these matters

> there is [the] broadest latitude for constitutionally permissible delegation to the Executive Branch, and the very conduct of the trial and inquiry on the merits may impair the nation's interests and defeat the purpose of making these matters non-reviewable.

Peoples v. United States Department of Agriculture, *supra*, 138 U.S.App.D.C. at 296, 427 F.2d at 566. However, it is abdication for the judiciary to step aside upon the mere incantation of the words "foreign affairs." Our analysis does not

---

16. For contrasting viewpoints on preclusion see Berger, Administrative Arbitrariness: A Synthesis, 78 Yale L.J. 965 (1969); Saferstein, Non-Reviewability: A Functional Analysis of "Committed to Agency Discretion", 82 Harv.L.Rev. 367 (1968).

end with the utterance of these words, it only begins. We note initially that we are merely faced with narrow questions of contract law here. Essentially, we are dealing with the implementation, not the formulation of policy. The issues raised deal with the applicability of statutes and regulations to a contract let under the Foreign Assistance Act. They do not deal with broad questions which necessarily involve considerable Executive discretion such as which intermediary credit institutions or Latin American countries should receive loan assistance from our government. Nor are we asked to review the wisdom, judgment or propriety of the President's waiver of certain laws in relation to the Foreign Assistance Act.[17] These forebodingly fecund matters were wisely placed beyond the ken of the judiciary. We are merely asked to determine the applicable law for a contract to resurface a Pan-American highway.[18] Surely, this is not a major matter of foreign policy. *Compare* Overseas Media Corp. v. McNamara, 128 U.S. App.D.C. 48, 54, 385 F.2d 308, 314

(1967). We are thus confronted with a different situation than that which we faced in Curran v. Laird, *supra*. In *Curran*, we refused to examine the span of possible executive action. In the instant case, however, the President has already acted and we are merely asked to examine the scope of that action.

Section 633(a) of the Foreign Assistance Act provides:

Whenever the President determines it to be in furtherance of the purposes of this chapter, the functions authorized under this chapter may be performed without regard to such provisions of law . . . regulating the making, performance, amendment, or modification of contracts and the expenditure of funds of the United States Government as the President may specify.

22 U.S.C. § 2393(a). The President has implemented the statute by waiving certain laws in Executive Order No. 11223, 30 Fed.Reg. 6635 (May 12, 1965) set forth in the margin.[19]

---

17. See pp. 1192–1193, *infra*.

18. We of course cannot invade the discretionary contractor selection process which involves considerations of price, judgment, skill, ability, capacity and integrity. *See* Scanwell Laboratories, *supra*, note 12, 137 U.S.App.D.C. at 381, 424 F.2d at 869.

19. *Executive Order 11223*
*Relating to the Performance of Functions Authorized By The Foreign Assistance Act of 1961, as Amended*
By virtue of the authority vested in me by Section 633 of the Foreign Assistance Act of 1961, as amended, 75 Stat. 454 (22 U.S.C. 2393), it is hereby determined that, to the extent hereinafter indicated, the performance of functions authorized by that Act, as amended, and any predecessor legislation, without regard to the laws specified in the numbered subdivisions of Sections 1 and 2 of this order and without regard to consideration as specified in Sections 3 and 4 of this order will further the purposes of the Foreign Assistance Act of 1961, as amended:
*Section 1.* With respect to functions authorized by the Foreign Assistance Act of 1961, as amended (22 U.S.C. 2151 et seq.), and any predecessor legislation ex-

cept those functions exercised by the Department of Defense under authority of Sections 621 and 623 of the Foreign Assistance Act of 1961 (22 U.S.C. 2381 and 2383):
(1) The Act of March 26, 1934, 48 Stat. 500, as amended (15 U.S.C. 616a). [Shipment of exports financed by Government in U.S. vessels]
(2) Section 3648 of the Revised Statutes, as amended, 60 Stat. 809 (31 U.S.C. 529). [Advances of public moneys; prohibition against]
(3) Section 305 of the Federal Property and Administrative Services Act of 1949, 63 Stat. 396, as amended (41 U.S.C. 255). [Advance or other payments; restrictions; conditions]
(4) Section 3709 of the Revised Statutes, as amended (41 U.S.C. 5). [Advertisements for proposals for purchases and contracts, for supplies or services for Government departments . . .]
(5) Section 3710 of the Revised Statutes (41 U.S.C. 8). [Opening bids]
(6) Section 2 of Title III of the Act of March 3, 1933, 47 Stat. 1520 (41 U.S.C. 10a). [Contracts for public works; specification for use of U.S. vessels]

Appellees submit that § 633 evinces a Congressional intent to remove the matter in controversy from the ambit of judicial consideration. In evaluating such a contention

[e]ach statute in question must be examined individually; its purpose and history as well as its text are to be considered in deciding whether the courts were intended to provide relief for those aggrieved by administrative action.

(7) Section 3735 of the Revised Statutes (41 U.S.C. 13). [Contracts limited to one year]

(8) Section 304(c) of the Federal Property and Administrative Services Act of 1949, as added by the Act of October 31, 1951, 65 Stat. 700 (41 U.S.C. 254(c)), but only with respect to contracts entered into with foreign governments or agencies thereof for the rendering of services to the United States or an agency thereof within the continental limits of the United States. [Examination of books, records, etc. of contractors . . .]

(9) Section 901(a) of the Merchant Marine Act, 1936, 49 Stat. 2015, as amended (46 U.S.C. 1241(a)). [Vessel operations revolving fund . . .]

*Sec. 2.* With respect to purchases authorized to be made outside the limits of the United States or the District of Columbia under the Foreign Assistance Act of 1961, as amended, and any predecessor legislation:

(1) Section 2276(a) of Title 10 of the United States Code. [Inspection and audit of plant and books of contractor . . .]

(2) Section 2313(b) of Title 10 of the United States Code. [Examination of books and records of contractor]

(3) Section 304(c) of the Federal Property and Administrative Services Act of 1949, as added by the Act of October 31, 1951, 65 Stat. 700 (41 U.S.C. 254(c)). [Examination of books, records etc. of contractors . . .]

. (4) Section 1301 of the Second War Powers Act, 1942, 56 Stat. 185 (50 U.S.C. App. 643), as extended by the provisions of the Act of June 30, 1953, 67 Stat. 120. [Plant, books and records of war contractors; definition of defense contract; agency designated to administer provisions]

(5) Section 3(b) of the Act of August 28, 1958, 72 Stat. 972 (50 U.S.C. 1433 (b)), but only with respect to contracts

Heikkila v. Barber, 345 U.S. 229, 233, 73 S.Ct. 603, 605, 97 L.Ed. 972 (1953).

The legislative history of the Foreign Assistance Act of 1961 indicates that § 633 "authorizes the President, whenever he determines it to be in furtherance of the purposes of the [Act], to waive such laws as he may specify . . . relating to Government contracts and expenditures." S.Rep.No.612, 87th Cong., 1st Sess. 43 (1961); U.S.Code Cong. & Admin.News 1961, p. 2513 "[Section 633

in which the inclusion of the clause required by Section 3(b), or the compliance with that clause, if included in a contract, is deemed by the executive or military department concerned to be impracticable. [Public record; examination of records by Comptroller General . . .]

*Sec. 3.* With respect to cost-type contracts heretofore or hereafter made with non-profit institutions under which no fee is charged or paid, amendments and modifications of such contracts may be made with or without consideration and may be utilized to accomplish the same things as any original contract could have accomplished, irrespective of the time or circumstances of the making, or the form of the contract amended or modified, or of the amending or modifying contract and irrespective of rights which may have accrued under the contract or the amendments or modifications thereof.

*Sec. 4.* With respect to contracts heretofore or hereafter made, other than those described in Section 3 of this order, amendments and modifications of such contracts may be made with or without consideration and may be utilized to accomplish the same things as any original contract could have accomplished, irrespective of the time or circumstances of the making, or the form of the contract amended or modified, or of the amending or modifying contract, and irrespective of rights which may have accrued under the contract or the amendments or modifications thereof, if the Secretary of State determines in each case that such action is necessary to protect the foreign policy interests of the United States.

*Sec. 5.* Executive Order No. 10784 of October 1, 1958, and Executive Order No. 10845 of October 12, 1959, are hereby superseded.

 *Lyndon B. Johnson*

The White House,
 *May 12, 1965*

was intended to provide] the flexibility required in connection with procurement and furnishing of foreign assistance." H.Rep.No. 851, 87th Cong., 1st Sess. 88 (1961).

The theme of flexibility is also discernable in the legislative precursors to § 633 —the Mutual Security Acts of 1952 and 1954. The House Report on the Mutual Security Act of 1952 states that a comparable proviso in the statute "allows exemptions [from laws which govern contracting by agencies of the United States and from laws regulating the expenditure of Government funds] of any of the functions or activities carried on under the Mutual Security Program. . . . These laws constitute impediments to the conduct of vital functions under the Mutual Security Program that are quite unlike domestic programs of the United States Government to which the laws primarily relate." H.Rep.No.1922, 82nd Cong., 2nd Sess. 105 (1952); U.S.Code Cong. & Admin.News 1952, p. 1598.

In commenting upon the history of a proviso substantially similar to § 633 in the Mutual Security Act of 1954 the House Report states:

> The purpose of this provision was to provide flexibility in connection with the procurement and shipment of commodities and other similar operations. It was felt that certain contract and accounting laws designed primarily for domestic operations of the Federal Government would unduly hamper or delay the furnishing of needed foreign assistance.

H.Rep.No.1925, 83d Cong., 2d Sess. 108 (1954). The House Report continues:

> In general, it may be said that Foreign Operations Administration, Defense, and the other agencies carrying out mutual security program functions adhere to the policies underlying the statutes from which [the Executive Or-

der] provides exemptions. The exemptions are used simply to remove strict statutory requirements to permit flexibility necessary to the carrying out of activities under the foreign aid program.

*Id.* at 109. *See also* S.Rep.No.1799, 83d Cong., 2nd Sess. 112–113 (1954); U.S. Code Cong. & Admin.News 1954, p. 3175.

Thus, the legislative history of § 633 and its predecessors clearly indicates a Congressional intent to permit the President greater flexibility and a concomitant concern for undue constriction. Indeed, the President has by Executive order exercised this option in exempting the Act from certain, though not all, laws relating to contracts and government expenditures. To say that the President should have flexibility is, however, not to say that judicial review is precluded. "[J]udicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). "[P]reclusion of judicial review . . . is not lightly to be inferred." Barlow v. Collins, *supra*, 397 U.S. at 166, 90 S.Ct. at 837.

To the extent the President has waived certain laws the parties obviously may not rely, nor may the court render, a decision upon them. However, since the President has only waived some, and not all, relevant laws, is this not an indication that those laws not waived must be followed? We are not asked to question the President's authority or wisdom in waiving certain laws, but merely asked to determine which laws he has waived and to what degree. For example, in waiving certain sections of the Public Contracts Act to what extent did the President intend to have the remaining sections of the Public Contracts Act,[20] the Procurement Regulations,[21] or the

---

20. The Comptroller General has held that AID is not bound by the general provisions of law regulating the making of contracts. Comp.Gen.Dec. B–154399 (No-

vember 17, 1964); B–149843 (November 5, 1962).

21. The general rules applicable to procurements by the departments and agencies

AID Regulations [22] continue to apply? [23] These are questions peculiarly appropriate for judicial resolution. Regardless of the applicability of other laws, it is clear the President must heed the Congressional mandate in the Foreign Assistance Act itself that

> . . . Assistance shall be furnished in such a manner as to promote efficiency and economy in operations so that the United States obtains maximum possible effectiveness for each dollar spent.

22 U.S.C. § 2151.[24]

■ In effect § 633 has not precluded judicial review, but merely limited our scope of inquiry. We therefore reverse and remand the case to the District Court to determine what laws and regulations apply to the contract in question, and what violations, if any, of the applicable laws have occurred. These are matters which are intertwined with the merits thereby necessitating consideration by the District Court upon adequate briefing from the parties. *See* Peoples v. United States Department of Agriculture, *supra*. Naturally we hazard no comments upon the merits of the case, but merely indicate that CONCICA is entitled to its day in court.

So ordered.

---

of the United States do not apply to AID according to the Comptroller General. B–168759 (April 15, 1970); Comp.Gen. Dec. B–168809 (March 17, 1970); B–165600 (September 12, 1969); B–158692 (April 11, 1966); B–157421 (January 19, 1966); B–152326 (December 6, 1963).

22. The Comptroller General has held that "recognition must be given to the primary authority of the financing agency to determine compliance with the regulations promulgated by it in furtherance of its statutory responsibility." Comp.Gen.Dec. B–168809 (March 17, 1970); B–168759 (April 15, 1970). *See also* Comp.Gen. Dec. B–152326 (December 6, 1963).

23. Similar questions have been raised before the Comptroller General. *See* Comp. Gen.Dec. B–165600 (September 12, 1969). Indeed a remarkably similar factual pattern has also appeared before the Comptroller General. *See* Comp.Gen.Dec. B–164676 (March 7, 1969).

24. The intermeshing of several statutes has led the Comptroller General to conclude that AID contracts must be let "under certain minimum rules of fair play and competition." Comp.Gen.Dec. B–158692 (April 11, 1966). *See also* Gonzalez v. Freeman, *supra*, note 9.