**CAMPAIGN CLEAN WATER, INC.**

v.

**William D. RUCKELSHAUS, Adm. Environmental Protection Agency.**

Civ. A. No. 18–73–R.

United States District Court,
E. D. Virginia,
Richmond Division.

June 5, 1973.

 

Alfred Jerome Owings, Richmond, Va., Alan B. Morrison and W. Thomas Jacks, Washington, D. C., for plaintiff.

Harlington Wood, Jr., Asst. Atty. Gen., of U. S., Brian P. Gettings, U. S. Atty., ED/VA, Harland F. Leathers, David J. Anderson, Dennis G. Linder, James R. Prochnow, Dept. of Justice, Washington, D. C., for defendant.

## ORDER

MERHIGE, District Judge.

In accordance with the memorandum this day filed and deeming it just and proper so to do, it is adjudged and ordered that:

1) Upon the Court's own motion, Robert W. Fri, Acting Administrator of the Environmental Protection Agency, shall be, and is hereby, substituted for William D. Ruckelshaus as the proper party defendant.

2) Campaign Clean Water, Inc., is granted leave to proceed in this action on behalf of its members and those similarly situated in the Commonwealth of Virginia.

3) Defendant's motion to dismiss shall be, and the same is hereby, denied.

4) Plaintiff's motion for summary judgment shall be, and the same is hereby granted.

5) It is declared that the announced policy of the Administrator to refuse to allot $6 billion of the designated $11 billion under Section 205 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. 1251 et seq., for the fiscal years 1973 and 1974 constitutes an abuse of discretion under the authority and powers conferred by the Act. Accordingly, said policy shall be, and the same is hereby, declared null and void.

6) The defendant is directed to report to the Court within ten (10) days of this date those actions taken to conform the administration of the Act to the principles enunciated in the memorandum.

## MEMORANDUM

MERHIGE, District Judge.

Campaign Clean Water, an environmental group organized to "promote the ecological and environmental advancement of Virginia," seeks in this action to compel the defendant Administrator of the Environmental Protection Agency (E.P.A.) to allot among the states the

full sums authorized to be appropriated by Section 207 of the Federal Water Pollution Control Act, as amended by Public Law 92–500 (the "Act") and to estop him from withholding funds so allotted. Jurisdiction is alleged pursuant to 28 U.S.C. §§ 1331 and 1361. The parties are presently before the Court pursuant to plaintiff's motion for summary judgment and defendant's cross-motion to dismiss. Respective counsel have submitted comprehensive memoranda on the issues raised, and it is upon same that this matter is ready for disposition.

The facts are not in dispute. For preliminary purposes they are as follows: On October 4, 1972 the Congress passed a water pollution bill authorizing appropriations in the amount of $11,000,000,000 for waste treatment plant construction grants for fiscal years 1973 and 1974. The bill was vetoed on October 17, 1972 by the President who stated that he found the measure to be of an "inflationary" nature. The Congress promptly overrode the veto. On November 28, 1972 the Administrator announced that pursuant to the President's direction he was allotting only $5,000,-000,000 of the total $11,000,000,000 for treatment plant construction projects for fiscal years 1973 and 1974. It is the Administrator's announced action, which is popularly referred to under the rubric of "impoundment of funds", which is challenged in this suit.

The issues raised are as follows:

1. Whether plaintiff has standing to maintain this action.

2. Whether this action is rendered moot by virtue of City of New York v. Ruckelshaus, 358 F.Supp. 669, CA No. 2466–72 (D.C.1973).

3. Whether the defendant is immune from this suit by virtue of the sovereign immunity doctrine.

4. Whether this matter presents a justiciable controversy.

5. Whether, upon the merits, plaintiff is entitled to the relief sought.

These issues will be considered in seriatim.

## I Standing

Campaign Clean Water, Inc., as described in the complaint, is a Virginia corporation "organized to promote the ecological and environmental advancement of Virginia. Its officers, directors, and financial contributors include Virginia residents who use the nation's waters for both sport and commercial fishing and for other recreational purposes." The affidavit of the organization's president, Newton H. Ancarrow, indicates that it was created through the efforts of various groups. Included among the founders is the Chesapeake Bay and its Tributaries Watermen's Union, whose members derive their income from shellfishing, and among its contributors are the Virginia Beach Innkeepers Association and other individuals who engage in boating and swimming on Virginia's waters and who own waterfront property. They allege that their interests are impaired by the discharge of untreated or inadequately treated sewage from overly burdened waste treatment plants into the waters of Virginia. In particular, it is alleged that individual members of the groups who have formed and contributed to Campaign Clean Water, Inc., have suffered economic injury from contaminated waters caused by sewage discharge from several plants operated by the Hampton Roads Sanitation District. Members of the Chesapeake Bay and its Tributaries Watermens Union, for example, allege that shellfish beds in the area have been rendered unusable by such contamination. The injuries of the various members of Campaign Clean Water, Inc., are tied to the acts of the defendant by the allegation, supported by a letter from the General Manager of the Hampton Roads Sanitation District, that the withholding of funds will have a disastrous effect on future plans for water treatment plants on Virginia's waters and will thus allow the injury to the plaintiff's interests to continue.

The doctrine of standing, emanating from the case or controversy requirement of Article III of the Constitu-

tion and from general principles of judicial administration, seeks to ensure that the plaintiff to an action has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the Court so largely depends . . ." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Problems of standing in actions against public officials may arise in either of two contexts, depending upon whether the plaintiff relies in his action upon a statute authorizing the invocation of the judicial process. The majority of cases in which the plaintiff relies upon such a statute involves the Administrative Procedure Act (APA) and its language granting the right of review to any party "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Standing in such cases is available only where the plaintiff has alleged active injury in fact at the hands of the defendant and where the alleged injury was to an interest "arguably within the zone of interests to be protected or regulated" by the statutory requirements to which the plaintiff seeks to compel adherence. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed. 2d 184 (1970). Where the plaintiff does not rely upon a specific statute such as the APA, he still must meet standing requirements which are virtually identical to those imposed by the APA. Specifically, he must allege an actual injury to himself and in addition show that such injury is to an interest that is protected by the legal right which he asserts is violated by the defendants' act. Linda R. S. v. Richard D., 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). As the Supreme Court has framed the second aspect, there must be a "logical nexus between the status [of the plaintiff] asserted and the claim sought to be adjudicated." Flast v. Cohen, 392 U.S. 83, 102, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968).

Although the plaintiff does not invoke the APA in pursuing this claim, the Court is satisfied that the action is one which could have been brought pursuant to that act. See City of New York v. Ruckelshaus, 358 F. Supp. 669, CANo. 2466-72 (D.D.C.1973). Even if it could not, however, the Court's foregoing discussion leads it to conclude that generally the same standards apply as would apply in an APA case. In either case, Campaign Clean Water clearly has standing in this action.

The allegations of the complaint and affidavit indicate that individual members of groups belonging to and contributing to the plaintiff suffer direct, pecuniary injury as a result of waste contamination in Virginia's waters. Such injury is particularized and sets these members apart from the public, in general. Since an organization whose members are injured may represent those members in judicial proceedings, Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); James River and Kanawha Canal Parks, Inc., v. Richmond Metropolitan Authority, 359 F.Supp. 611 (E.D. Va.1973), Campaign Clean Water, Inc., may assert these claims. The fact that the groups representing the individuals injured rather than the individuals themselves are the actual members of Campaign Clean Water is unimportant, since it is the interests of the individual persons that the plaintiff ultimately represents.

The Court further finds that the requisite nexus between the injury and the right asserted exists in this case. The plaintiff by its allegations directly attributes the injury incurred to the inadequacy of waste treatment plants, particularly in the Hampton Roads area. With federal money, new treatment plants will be built and old ones improved, all of which will lessen the exist-

ing damage suffered by the plaintiff. Since the plaintiff's assertion is that the defendant is under a duty to release federal funds for waste treatment plants, it is clear that the injury incurred falls within the scope of interests benefited by that duty. Accordingly, Campaign Clean Water, Inc., has standing to pursue this action.

### II   Mootness

■ The Court *sua sponte* raises the issue of mootness in view of the recent District Court decision of Judge Oliver Gasch in City of New York v. Ruckelshaus, 358 F.Supp. 669, CANo. 2466–72 (D.D.C.1973). In that action, the plaintiffs, the Cities of New York and Detroit, challenged the refusal of the present defendant to allot the funds appropriated under the Act which are the subject of this action. Judgment was entered for plaintiffs. Whether or not the Administrator will appeal that decision is unknown at this time.

The Court has examined Judge Gasch's opinion and concludes that, in light of the relief sought and order entered in that matter, the present action is not moot.

The City of New York sued on behalf of itself and all similarly situated municipalities in the State of New York. The City of Detroit, additionally, was granted leave to intervene as plaintiff. While the relief granted included *inter alia* declaratory and injunctive relief which applies to the whole fund, the Court has some doubts that the present plaintiffs could, in view of the class definition in *City of New York,* properly enforce that judgment as it applies to them.

There is, however, a more compelling reason militating against mootness which, in part, derives from the peculiar nature of the administrative procedures under the Act. While these procedures will be reviewed at length *infra,* for these purposes a brief summary will suffice.

The procedure is as follows:

Section 207 authorizes specific sums of money to be appropriated. The administrator is required by § 205 to allot the sums in accordance with a formula set forth in § 205(a). Once allotted to the states or municipalities' contract authority exists up to these amounts. In a second stage, the Administrator reviews grant applications from the states and municipalities to determine whether they satisfy the criteria of § 204 of the Act. Once these plans are approved, a contractual obligation on the part of the United States arises to pay the federal share allocable to the project. In sum, there is a two step process of 1) allotment and 2) expenditure.

The *City of New York* suit challenged only alleged abuses of discretion by the defendant with respect to allotment. Relief with respect to the expenditure stage was neither sought nor granted. This action seeks relief with respect to alleged abuses of discretion or possible abuses of discretion at both stages of the program. For this reason as well, this action is not moot.

### III   Sovereign Immunity

■ The defendant grounds his motion to dismiss in part upon an asserted application of the "sovereign immunity" doctrine. The gravamen of that doctrine has been stated in Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947): a suit is one against the sovereign, and therefore barred, if "[t]he 'essential nature and affect of the proceeding' may be such as to make plain that the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration." While the instant matter squarely falls within this definition, it also falls within a well-settled exception to the sovereign immunity doctrine.

Said exception is expressed in Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), which holds that a suit may be brought against an officer of the United States to challenge an action which allegedly exceeds statutory authority or, if within the scope of au-

thority, is premised upon a power which is unconstitutional. See also Malone v. Bowdoin, 369 U.S. 643, 647, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962). One common vehicle for challenging an official's action upon this theory is mandamus jurisdiction, 28 U.S.C. § 1361, which is relied upon here by plaintiff.

■ The complaint alleges that the defendant has exceeded his statutory authority in impounding funds. If sustained on the merits, plaintiff will come within the above recited exception to the doctrine. Accordingly, at this stage, the Court is satisfied that Campaign Clean Water has carried its burden in overcoming the bar of sovereign immunity.

## IV  Justiciable Case or Controversy

The defendant urges that this action does not present a justiciable case or controversy. A two-pronged argument is presented, and the two issues raised thereby will be considered in turn.

### A.  Ripeness

■ Defendant contends that this action is premature. The gravamen of that argument is that plaintiff (or those interests it represents) is without a claim absent specific denial of funds to proposed projects. Because no proposals have been submitted and rejected, it is argued that the present claim is hypothetical.

Defendant's argument is without merit. Legislative history is probative of the fact that the scheme of allotment followed by obligation was adopted in the Act to facilitate long range planning, a necessary element in the development of water treatment plants. 118 Cong.Rec.H. 2727 (3/29/72); *City of New York, supra.* Because funds are allotted on a yearly basis (Section 207), it appears that those funds not allotted in the appropriate year are forever lost.[1] The failure to allot, therefore, may have a decisive and detrimental impact upon treatment plant development planning.

Said impact gives rise in part to the injuries alleged here and satisfies the Court that this action is not premature.

### B.  Political question

■ The defendant urges that plaintiff has called upon the Court to decide a "political question," which it is asserted is beyond the proper exercise of federal court jurisdiction. Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946), Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). While the Court is cognizant that the issue raised here has contemporary political overtones, it is satisfied, for reasons that follow, that this matter does not present a political question in the legal sense. The Supreme Court in Baker v. Carr, 369 U.S. at 217, 82 S.Ct. at 710 clarified this distinction and enunciated as well the standard by which political questions may be identified:

It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made, or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

---

1. However, funds allotted for a given year but not obligated may be reallotted the following fiscal year § 205 (b) (1).

Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence. The doctrine of which we treat is one of "political questions," not one of "political cases." The courts cannot reject as "no law suit" a bona fide controversy as to whether some action denominated "political" exceeds constitutional authority.

In determining whether this action, by reason of the above recited standards, presents a political question, the Court has considered defendant's assertion that "[w]hile spending controls are not 'textually committed' by the Constitution to any of the three departments, it is clearly not a matter for the judiciary. Moreover, the grant of 'executive power' in Article II comes very close to a 'textually demonstrable' commitment of this responsibility to the President." Defendant's brief at 11. Defendant overstates the issue here present: *contra* to defendant's broad assertions, the Court is required to determine whether the specific Act in question mandates spending policies in contravention to those announced by the Administrator. This is a narrow issue and a matter of statutory interpretation. The Court recognizes that this conclusion impliedly makes short shrift of defendant's underlying contention that spending of funds legislatively appropriated is solely within the province of executive discretion. Nevertheless, to support defendant's contention would require the Court to postulate a broad reading of executive power which includes the proposition that the Congress may make funds available for spending or mandate the manner in which they are spent, but may not mandate that they, in fact, be spent. That contention has in essence been firmly rejected in a well-reasoned opinion by Judge Jones in Local 2677 v. Phillips, 358 F.Supp. 60 (D.D.C.1973). As Judge Jones noted in language appropriate here, "[t]he defendant really argues that the Constitution confers the discretionary power upon the President to refuse to execute laws passed by Congress with which he disagrees."

More than a century ago the United States Supreme Court laid to rest any contention that the President has the power suggested. See Kendall v. United States, 12 Pet. 524, 37 U.S. 524, 9 L.Ed. 1181 (1838), where the Court stated:

To contend, that the obligation imposed on the president to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible. 37 U.S. at 611.

See also National Automatic Laundry v. Shultz, 143 U.S.App.D.C. 274, 443 F.2d 689, 695 (1971), holding that "the judicial branch has the function of requiring the executive (or administrative) branch to stay within the limits prescribed by the legislative branch."

Accordingly, the issue before the Court calls for an interpretation of the Act. There is no issue here vis-a-vis "executive power" and in that respect this case does not present a political question. Defendant also urges that there is a "lack of judicially discoverable and manageable standards for resolving" the questions posed here. The Court disagrees. The Court is not being asked to supervise the operations of the EPA. Solely sought here is declaratory and injunctive relief with respect to the announced policy of impoundment. The standards for fashioning that relief, if appropriate, will be discussed in conjunction with the merits. At this stage, however, the Court fails to discern a political question lurking in the record before it.

### V   The Merits

Plaintiff essentially challenges the defendant's announced policy with respect to impoundment of allotments and prays as well that the Court retain jurisdiction so as to grant appropriate relief to prevent abuse of discretion with respect to appropriations. The allotment question will be considered first.

## A. Allotment

The relevant portions of the Act read *inter alia* as follows:

### Allotment

Sec. 205. (a) Sums authorized to be appropriated pursuant to section 207 for each fiscal year beginning after June 30, 1972, shall be allotted by the Administrator not later than the January 1st immediately preceding the beginning of the fiscal year for which authorized, except that the allotment for fiscal year 1973 shall be made not later than 30 days after the date of enactment of the Federal Water Pollution Control Act Amendments of 1972. Such sums shall be allotted among the States by the Administrator in accordance with regulations promulgated by him, in the ratio that the estimated cost of constructing all needed publicly owned treatment works in each State bears to the estimated cost of construction of all needed publicly owned treatment works in all of the States. For the fiscal years ending June 30, 1973, and June 30, 1974, such ratio shall be determined on the basis of table III of House Public Works Committee Print No. 92–50. Allotments for fiscal years which begin after the fiscal year ending June 30, 1974, shall be made only in accordance with a revised cost estimate made and submitted to Congress in accordance with section 516(b) of this Act and only after such revised cost estimate shall have been approved by law specifically enacted hereafter.

### Authorization

Sec. 207. There is authorized to be appropriated to carry out this title, other than sections 208 and 209, for the fiscal year ending June 30, 1973, not to exceed $5,000,000,000, for the fiscal year ending June 30, 1974, not to exceed $6,000,000,000, and for the fiscal year ending June 30, 1975, not to exceed $7,000,000,000.

The specific issue is whether the language of § 205, "Sums authorized to be appropriated . . . shall be allotted . . . ." allows the discretionary impoundment policy announced by the Administrator. The parties have taken preliminary positions upon the face of the statute. Plaintiff urges that the phrase *"shall* be allotted" proscribes the exercise of discretion announced by the defendant; the Administrator, on the other hand, urges that the language "not to exceed" in section 207 is expressive of the range of discretion built into the Act. See Housing Authority of San Francisco v. United States Department of Housing and Urban Development, 340 F.Supp. 654 (N.D.Cal.1972). Because the statute itself gives rise to conflicting interpretations, inquiry directed beyond the precise language is called for.

Defendant urges that legislative history is supportive of his position. Specifically he cites amendment of the language in question by a House-Senate conference committee which deleted the word "all" before the phrase "sums authorized to be appropriated" in § 205 and the addition of the aforementioned phrase "not to exceed" in § 207. With specific reference to § 205 the Court finds the amendment highly significant. Thus, the House bill originally considered read:

"*All* sums authorized to be appropriated . . . shall be allotted by the Administrator . . ." (emphasis supplied).

The amended section reads as amended:

"Sums authorized to be appropriated . . . shall be allotted by the Administrator . . ."

Defendant urges that the only logical interpretation of this amendment is that the Congress did not intend that "all" sums authorized be appropriated, or conversely, that the Administrator was given authority to exercise his discretion in that regard. The views of Congressman Harsha, the House sponsor, are supportive of this view:

Furthermore, Mr. Speaker, we have emphasized over and over again that

if Federal spending must be curtailed, and if such spending cuts must affect water pollution control authorizations, the administration can impound the money.

I want to point out that the elimination of the word "all" before the word "sums" in section 205(a) and insertion of the phrase "not to exceed" in section 207 was intended to emphasize the President's flexibility to control the rate of spending. 118 Cong.Rec. H. 10268.

Yet the Senate sponsor, Senator Muskie, was of the opinion that this "flexibility to control the rate of spending" occurred at the obligation rather than allotment stage:

Under the amendments proposed by Congressman WILLIAM HARSHA and others, the *authorizations for obligational authority* are "not to exceed" $18 billion over the next 3 years. Also, "all" sums authorized to be obligated need not be committed, though they must be allocated. These two provisions were suggested to give the Administration some flexibility concerning the obligation of construction grant funds.

*Id.,* at S 16871 (emphasis added).

This view is itself not inconsistent with other remarks by Congressman Harsha which followed his above recited statement:

I might add, while this legislation does provide for contract authority, the present administration recommended contract authority in H.R. 18779, the bill I introduced in behalf of the administration some time ago. Furthermore, let me point out, the Committee on Public Works is acutely aware that moneys from the highway trust fund have been impounded by

the Executive. Expenditures from the highway trust fund are made in accordance with similar contract authority provisions to those in this bill. Obviously expenditures and appropriations in the water pollution control bill could also be controlled. However, there is even more flexibility in this water pollution control bill because we have added "not to exceed" in section 207, as I indicated before.

Surely, if the administration can impound moneys from the highway trust fund which does not have the flexibility of the language of the water pollution control bill, it can just as rightly control expenditures from the contract authority produced in this legislation by that same means.[2]

Second, I would like to point out that the Administrator of the Environmental Protection Agency must approve plans, specifications, and estimates. This is the pacing item in the expenditures of funds. It is clearly the understanding of the managers that under these circumstances the Executive can control the rate of expenditures.

*Id.* at H. 10268.

Judge Gasch in *City of New York* concluded from this language and other by-play that, in accordance with Senator Muskie's views, the discretionary elements incorporated into the Act and referred to by the various legislators were meant to apply to executive control over the "rate of spending," but that the rate of spending was to be monitored only at the obligation stage and not by the withholding of allotments.

▬▬▬ This Court respectfully declines to adopt this interpretation, primarily because it appears to de-emphasize the syntactical history of Section 205 which shows the purposeful removal

**2.** As Judge Gasch observed in *City of New York,* Cong. Harsha's position has itself been rendered suspect by a subsequent Court decision:

It should be noted that the Court of Appeals for the Eighth Circuit has construed the Federal-Aid Highway Act as

requiring obligation of allotted funds, and has thus declared the impoundments referred to by Congressman Harsha to be illegal. State Highway Commission of Missouri v. Volpe, 479 F.2d 1099 (8th Cir., 1973).

of the word "all" from § 205. While the legislative debates lend strength to Judge Gasch's conclusion, the Court, the plaintiff, and, to a limited extent, the defendant, are in agreement that legislative history is in the main unclear, politically charged, and in the Court's view, to some degree based upon suspect constitutional interpretation of the powers of the President.[3] In this context the syntactical history must be given great weight. See generally Gilbert v. General Electric, 347 F.Supp. 1058 (E.D.Va. 1972). The Court accordingly concludes that the Congress did intend for the executive branch to exercise some discretion with respect to allotments. Plaintiff, in fact, does not seriously dispute this conclusion, but contends that "the Congress could not have intended to give the Administrator the discretion to gut the Act." This latter contention merits close scrutiny.

Legislative history from the time of the veto is especially helpful because the executive's position with regard to the bill passed was framed in the context of its alleged inflationary impact. Accordingly, the issue of just how much was required to be spent under the terms of this legislation was central to the discussion that followed.

The President's veto message with regard to the Act is made perfectly clear in the following language from his veto message:

Certain provisions of . . . [the bill] confer a measure of spending discretion and flexibility upon the President, and *if forced to administer this legislation I mean to use those provisions to put the brakes on budget-wrecking expenditures as much as possible.*

But the law would still exact an unfair and unnecessary price from the public. For I am convinced . . . that the pressure for full funding under this bill would be so intense that funds approaching the maximum authorized amount could ultimately be claimed and paid out, no matter what technical controls the bill appears to grant the Executive. 118 Cong.Rec. at H 10266 (daily ed. October 18, 1972) (emphasis added).

Both houses of Congress promptly overrode the veto. Prior to the respective votes, Senator Muskie reiterated the national commitment to clean water,[4] and cognizant of the spending discretion vested by the Act in the President, urged that the large scale policy adopted be reaffirmed by overriding the veto. 118 Cong.Rec.S. 18546 et seq. Eighty-one percent of the Senators present voted to override.

Representative Harsha, upon resubmission, expressly addressed the alleged inflationary nature of the bill, stating that a large scale water improvement effort was worth the price that might be caused:

I don't think there is one Member of this body who has not asked his constituents whether or not they were willing to pay the high price to achieve our national environmental goals. I don't think that there is one Member of this body who could report that after such polling, his constituents objected * * *

* * * [T]he President maintained that a vote to override the veto of the Water Pollution Act Amendments of 1972 was a vote to increase the likelihood of higher taxes. So be it, the public is prepared to pay for it. To say we can't afford this sum of money is to say we can't afford to support life on earth. Id. at H 10268.[5]

---

3. See note 2, *supra* (re: highway fund impoundments) and discussion at page 695, *ante* (re: general power of the executive to withhold funds absent congressional authorization.)

4. Interestingly, the Senate had originally chosen not to pass an administration bill

(S 1013) which would have authorized sums close to those slated for spending under the challenged impoundment policy.

5. The tenor of these remarks is akin to the remark of Senator Muskie prior to passage of the bill:

* * * [T]hose who say that raising the amounts of money called for in this

The House voted by a margin of 91% of those present to override.

From the above recited history, the Court draws several conclusions:

1) The Congress passed a large scale clean water bill committing the nation to an extensive program to fight pollution. In so doing, the Senate rejected a smaller scale commitment proposed by the administration.

2) The Congress purposefully incorporated provisions in the Act which would allow some degree of spending discretion by the executive. These provisions were motivated in part by a desire to avoid a veto, see 118 Cong.Rec. at S. 16871, and in part by the assumption of some legislators (notably Rep. Harsha), but not all (notably Senator Muskie), that some funds may be impounded.

3) The President vetoed the bill because of its alleged inflationary impact, notwithstanding his recognition of the discretionary provisions of the bill.

4) The Congress overrode the veto by large margins, reaffirming the massive national commitment to environmental protection and the willingness to incur vast expenses in achieving that commitment.

Upon the foregoing, the Court is well-satisfied that the challenged impoundment policy, by which 55% of the allocated funds will be withheld, is a violation of the spirit, intent and letter of the Act and a flagrant abuse of executive discretion. Accordingly, the Court will enter a declaratory judgment holding that that policy is null and void.

[15] Further relief, however, is not now required. The Court will not and

cannot supervise the Administrator in the administration of the Act. Issuance of an injunction would accordingly be inappropriate. While the Court has no reason to conclude that the defendant will not make a good faith effort to proceed in the allotment of funds in accordance with the letter and spirit of this memorandum, it does note that the plaintiff may at any time move to reopen this matter so as to contest such future actions or lack of actions on the part of the Administrator as they may contend are arbitrary, capricious or violative of the Act as herein enunciated. At this stage, the Court will only require that the defendant report to the Court within ten (10) days of this date such actions as have been taken to conform the administration of the program to the principles enunciated in this memorandum.

## B. Appropriations

For the reasons heretofore stated, the Court is satisfied that the defendant may not with propriety adopt policies which contravene the letter and spirit of the Act. However, specific relief with respect to future appropriations at this stage would be premature, especially in view of the expert discretion designed for the appropriations stage. See *City of New York, supra.* For these purposes, the Court concludes that the declaratory relief issued with respect to the allotment stage will place the defendant on notice that a similarly designed and motivated impoundment policy with respect to appropriations would contravene the letter and spirit of the Act.

legislation may require higher taxes, or that spending this much money may contribute to inflation simply do not understand the language of this [water pollution] crisis.

The conferees spent hours and days studying the problem of financing the cleanup effort required by this new legislation. The members agreed in the end that a total of $18 billion had to be committed by the Federal Government

in 75-percent grants to municipalities during fiscal years 1973–75. That is a great deal of money; but that is how much it will cost to begin to achieve the requirements set forth in the legislation. * * *

* * * [T]he conferees are convinced that the level of investment that is authorized is the minimum dose of medicine that will solve the problems we face. 118 Cong.Rec. S. 16870 et seq.

### VI Scope of Relief

In view of the nature of the relief granted, the Court declines to issue same with respect to those interests not represented directly by plaintiffs. To do otherwise would potentially burden the Court and prospective parties with reviewing individual actions of the Administrator which may apply to locations in more appropriate forums. Accordingly, declaratory judgment will be issued only with respect to those interests in Virginia represented by the plaintiff organization. This determination as well precludes further difficulties of class determination and notice not warranted by the nature of the relief given.

An order consistent with this memorandum shall issue.