**CAMPAIGN CLEAN WATER, INC.,**
Appellee,

v.

**Russell E. TRAIN, Administrator, Environmental Protection Agency,**
Appellant.

No. 73-1745.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 2, 1973.

Decided Dec. 10, 1973.

---

Edmund W. Kitch, Atty. U. S. Dept. of Justice (Irving Jaffe, Acting Asst. Atty. Gen., Brian P. Gettings, U. S. Atty., Rodney Sager, and David G. Lowe, Asst. U. S. Attys., William D. Appler and Walter H. Fleischer, Attys., U. S. Dept. of Justice, on brief) for appellant.

W. Thomas Jacks, Washington, D. C. (Alan B. Morrison, Washington, D. C., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and RUSSELL and FIELD, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

Like a number of other pending actions,[1] this suit, brought by an envi-

---

1. *See*, City of New York v. Ruckelshaus (D. C.N.Y.1973) 358 F.Supp. 669; Brown v. Ruckelshaus and City of Los Angeles v. Ruckelshaus (D.C.C.D.Cal.1973) (decided

ronmental group concerned with water quality in Virginia, involves the discretionary power, if any, of the defendant Administrator, Environmental Protection Agency, to allot appropriation authority for fiscal 1973 and 1974, particularly as those allotments relate to Virginia, under the provisions of Section 205 of the Federal Water Pollution Control Act Amendments of 1972.[2] The Act sets forth a comprehensive legislative program for controlling and abating water pollution.[3] In Subchapter II of that Act, provision is made for federal financial assistance to states and localities in planning and constructing sewage treatment plants, designed to assist in assuring the prompt attainment of specified standards of water quality.[4] Under Section 207 of that Subchapter,[5] grant authorizations [6] are made "for the fiscal year ending June 30, 1973, not to exceed $5,000,000,000, for the fiscal year ending June 30, 1974, not to exceed $6,000,-000,000, * * * ." The grant authorizations in Section 207 are supplemented by Section 205 which provides for the allotment by the Administrator of such authorizations as approved among the States on a statutorily stated formula "not later than the January 1st immediately preceding the beginning of the fiscal year for which authorized, except that the allotment for fiscal year 1973 shall be made not later than 30 days after October 18, 1972."

On November 22, 1972, the President wrote the Administrator directing the latter not to "allot among the States the maximum amounts provided by section 207"; specifically, he directed that, "[N]o more than $2 billion of the amount authorized for the fiscal year 1973, and no more than $3 billion of the amount authorized for the fiscal year 1974 should be allotted." In directing such action, the President referred to the fact that the Act "permits a significant increase over our programs to fund the construction of wastewater treatment facilities" and stated that budget requests for funding such construction under the earlier programs in fiscal 1973 amounted to "$2 billion". In fixing the allotments to be made under Section 205, the President observed that, "[T]hese amounts will provide for improving water quality and yet give proper recognition to competing national priorities for our tax dollars, the resources now available for this program and the projected condition of the Federal treasury under existing tax laws and the statutory limit on the national debt "

The plaintiff brought this action for both declaratory and injunctive relief in connection with the administration of the Act. By way of declaratory relief,

8/17/73) ; Martin-Trigona v. Ruckelshaus (D.C.N.D.Ill.1973) (decided June 28, 1973) ; Minnesota v. USEPA (D.Minn.1973) (decided June 25, 1973).

2. Section 1285, 33 U.S.C.

3. Section 1251 et seq., 33 U.S.C. The legislative history is set forth in U.S.Code Cong. & Adm.News, 92d Cong., 2d Sess., pp. 3668, et seq.

4. Section 1281 et seq., 33 U.S.C.

5. Section 1287, 33 U.S.C.

6. The statutes involved in this action concern not direct appropriations but what has often been described as "obligational authority". The Office of Management and Budget, in its listing of appropriated funds withheld from disbursement, omitted those represented by "obligational authority". See, New York Times, Feb. 6, 1973, at 1, col. 1 (city ed.). In principle, however, the difference between the two is unimportant, so far as the issues in this proceeding are concerned. As one commentator has aptly remarked, "Appropriations are passed in various forms, and permit actual expenditures as well as the incurring of obligations. However, there is another species of financial authority, the contract authorization [also termed obligational authority], which empowers the governmental unit only to incur obligations. Under such contract authority power, the agency will have to later request an appropriation to liquidate the obligations it has incurred." Note, The Likely Law of Executive Impoundment, 59 Iowa L.Rev. 50, 54 (1973). There is thus no reason to treat the two forms of authorizations other than as appropriations and to adjudge the right of the executive to withhold the same in both instances. See, Note, Impoundment of Funds, 86 Harv.L.Rev. 1505, 1506, n. 2 (1973).

it asked judgment that "(a) the defendant [Administrator] lacks the discretion to refuse to allot among the states the full sums authorized by Congress; or, alternatively, (b) the defendant abused whatever limited discretion he possesses by withholding a greater amount of funds than contemplated by the Congress under the Act." It, also, requested injunctive relief, "directing the defendant to allot among the states the full sums of $5 billion and $6 billion authorized to be appropriated by section 207 of the Act for fiscal years 1973 and 1974." Without answering, the defendant Administrator moved to dismiss on the grounds "that the Court lacks jurisdiction over the subject matter of this suit and that the Complaint fails to state a claim upon which relief can be granted." At the same time, the plaintiff moved for summary judgment "on the grounds that there is no genuine issue as to any material fact and that, * * * plaintiff is entitled to judgment as a matter of law." After a hearing, the District Court denied the motion of the defendant to dismiss and granted in part the motion of the plaintiff for summary judgment.[7] From that

decision, the defendant Administrator appeals. We remand for further proceedings.

## I.

The defendant Administrator at the outset raised a number of procedural barriers to the maintenance of this action. He put in issue the standing of the plaintiff to maintain this action, the justiciability of the issues, the prematureness of the proceedings, and finally, the bar of sovereign immunity. These claims were carefully considered in the thoughtful opinion of the District Court and were found meritless. For the reasons assigned by the District Court and for the reasons hereafter developed, we agree.

## II.

Turning to the substantive controversy: The plaintiff concedes the Congress intended to give the executive certain discretion in making allotments under Section 205; the defendant Administrator asserts the existence of such discretion; and the District Court found that there was such discretion.[8] The exis-

---

7. The decision of the District Court is reported in 361 F.Supp. 689.

8. Thus the plaintiff in its brief, states the issues on appeal to be "whether, in passing the Federal Water Pollution Control Act Amendments of 1972, Congress intended to give the President boundless discretion to withhold funding under the Act, or whether, as plaintiffs contend and the district court held, the discretion granted the Executive is limited and was grossly exceeded."

While a number of courts have found a want of discretion in the Administrator in fixing the authorized allotments, the commentators on the Act are not as definite in their opinions. See, for instance, Note, The Likely Law of Impoundment, 59 Iowa L.Rev. 50, 55, n. 42 (1973) and Note, Impoundment, 86 Harv.L.Rev. 1505, 1526, n. 116; but cf., Note, Protecting the Fisc: Executive Impoundment and Congressional Power, 82 Yale L.J. 1636, 1952. The issue of discretion, it is conceded by one of the commentators is plainly "arguable", something that cannot be said, it suggests, with reference to the appropriation made in support of the Federal Aid Highway Act, Section 101-44, 23 U.S.C., involved in

State Highway Commission v. Volpe (8th Cir. 1973) 479 F.2d 1099, 50 Iowa L.Rev. at p. 55. In fact, Congress made it as plain as it could in the Highway Act that it intended to confer no right of impoundment on the executive. (See Page 1111, 479 F.2d.)

Ralph Nader, in his testimony before the Senate Ad Hoc Committee on Impoundments (hereafter referred to as Impoundment Hearings) ranged himself with those who found discretion in the executive in executing Section 205. He testified in this connection:

"Granted, the legislative history of these 1972 amendments suggests that Congress may have intended to grant the President limited discretion in controlling the level of obligations. However, the decisive overriding of the veto indicated a clear congressional mandate to have sufficient funds immediately available for obligation to meet the timetable for water quality goals which the act established." (at 34)

For a thoughtful statement of reasons for discretionary spending authority in the executive, see Fisher, Presidential Spending Discretion and Congressional Controls, appear-

tence of discretion, therefore, is not in issue on this appeal. The point of controversy is the extent of that discretion and the power of the Court to review. The plaintiff, in the District Court, contended that the discretion granted by Congress to the Administrator was not "unbridled"; that specifically it was not broad enough "to give the Administrator the discretion to gut the Act." In developing this contention, it emphasized the purposes and goals of the Act and argued that the Administrator's discretion may not be exercised in a manner and to an extent that the purposes of the Act are frustrated and nullified and that Courts have both the power and the duty to prevent such nullification. The defendant, on the other hand, took the position that, while the Administrator had not by his limited allotments frus-

trated the legislative purposes reflected in the Act, he has absolute discretion in making such allotments, and that his exercise of discretion is immune from judicial review. In resolving these conflicting positions, the District Court found that, on its face, an "impoundment policy,[9] by which 55% of the allocated funds will be withheld, is a violation of the spirit, intent and letter of the Act and a flagrant abuse of executive discretion."[10] It found authority to declare judgment "that that policy is null and void".[11] Though it thus found the allotments as fixed by the Administrator invalid, it denied injunctive relief on the ground the Court was not equipped to "supervise the Administrator in the administration of the Act", partially because of "the expert discretion designed for the appropriations

---

ing in the Winter, 1972, issue of Law and Contemporary Problems and quoted in Impoundment Hearings, at 719:

"The reform advocate is therefore advised to regard executive spending discretion as an essential, ineradicable feature of the budget process. Expenditures deviate from appropriations for a number of reasons. Appropriations are made many months, and sometimes years, in advance of expenditures. Congress acts with imperfect knowledge in trying to legislate in fields that are highly technical and constantly undergoing change. New circumstances will develop to make obsolete and mistaken the decisions reached by Congress at the appropriation stage. It is not practicable for Congress to adjust to these new developments by passing large numbers of supplemental appropriation bills. Were Congress to control expenditures by confining administrators to narrow statutory details it would perhaps protect its power of the purse but it would not protect the purse itself. Discretion is needed for the sound management of public funds."

But, cf., the comment of the editor in 82 Yale L.J. 1636, at p. 1640, n. 26:

"It is important to note that this argument at its strongest only establishes a limited kind of impoundment power for the Executive, the power to impound when conditions intrinsic to the program indicate that further spending would be wasteful. There is no principle that would indicate that the President must necessarily have all impoundment powers or none at all."

9. The term "impoundment" has provoked some disagreement. The editor in one recent Note would define it "as the executive practice of withholding appropriated funds or obligational authority, beyond the bounds of any statutorily conferred discretion." Note, 59 Iowa L.Rev. 50, 56 (1973). Similarly, Professor Miller defines it as "deliberate attempts to scuttle projects authorized by Congress, but disliked by the Executive." Impoundment Hearings, at 752. This would limit the application of the term to those acts of the Executive which represent an illegal withholding of appropriated funds. Other authorities use the term to identify any executive withholding of appropriated funds and make no effort to engage in the "semantic" game. Thus, in the Note, Impoundment of Funds, 86 Harv.L.Rev. 1505, n. 1, impoundment is defined as a "refusal by the executive, for whatever reason, to spend funds made available by Congress." Another writer uses similar language, stating that, "In its broadest context, impoundment occurs whenever the President spends less than Congress appropriates for a given period." Fisher, Funds Impounded by the President: The Constitutional Issue, 38 Geo.Wash.L.Rev. 124 (1969). This would seem the more sensible definition. Under this definition, any withholding would be an impoundment and whether such impoundment was permissible would depend on the legislative intent.

10. 361 F.Supp. at 700.

11. 361 F.Supp. at 700.

stage." [12] And, finally, it limited the application of its judgment "to those interests in Virginia represented by the plaintiff organization." [13]

As we have already stated, the right of the defendant to exercise discretion in making the allotment under Section 205 is not challenged by this appeal: that right is conceded. We are not concerned with the question whether an appropriation, either by its very nature [14] or under the terms of the Antideficiency Act,[15] even in the absence of any expressed grant of executive discretion in its use, involves some element of discretion in the executive. We are dealing here with a legislative provision which it has been held (and from this holding there is no appeal) does vest the executive with discretion. In short, the issues on this appeal are whether, accepting the holding that there was discretion in this case, its exercise is judicially reviewable, and, if reviewable, what standards or criteria are to be used in assessing the validity of its exercise. Those are the only issues posed by the appeal.

■ It is the defendant's position that, by conceding executive discretion in the fixing of the allotments under Section 205, the plaintiff has admitted a want of judicial power to review his exercise of that discretion. He rests this argument upon Section 10 of the Administrative Procedure Act,[16] which provides that administrative action, the exercise of which is "committed to agency discretion" is not judicially reviewable. *Cf.*, Davis, Administrative Law Treatise, 1970 Supp., § 28.16, p. 964. What the defendant urges is similar to the administrator's argument in Overseas Media Corporation v. McNamara (1967) 128 U.S.App.D.C. 48, 385 F.2d 308, 316, n. 14, *i. e.*, that we should "adopt the view

---

12. 361 F.Supp at 700.

13. 361 F.Supp. at 701.

14. It has been sometimes stated that an appropriation is *"permissive* rather than *mandatory"*, by which the author states "it is meant that the Executive Branch is *authrized* but not *required* to spend funds up to a given amount for designated purposes." (Italics in text.) Miller, Presidential Power to Impound Appropriated Funds: An Exercise in Constitutional Decision-Making, 42 N.C.L.Rev. 502, 511 (1965). In somewhat similar vein, Professor Corwin summed the matter up with the statement that the Constitution "assumes any expenditure is primarily an executive function, and conversely that the participation of the legislative branch is essentially for the purpose simply of setting bounds to executive discretion—a theory confirmed by early practice under the Constitution." Corwin, The President: Office and Powers, 127–8 (4 ed. 1957).

*See, also*, McKay v. Central Electric Power Co-operative (1955), 96 U.S.App.D.C. 158, 223 F.2d 623, 625.

15. Section 665, 31 U.S.C. This section authorizes the executive to withhold funds "to provide for contingencies, or to effect savings whenever *savings* are made possible by or through changes in requirements, greater efficiency of operations, or *other developments* subsequent to the date on which such appropriation was made available" (Italics added, 665(c)(2).) Two constructions of the terms "savings" and "other develop-

ments" have been advanced. Under a narrow view, these terms relate to "developments within the individual programs involved, and that impoundment is only permissible to the extent that it does not interfere with achieving the underlying purposes of the program involved." Note, Impoundment, 86 Harv.L.Rev. at p. 1517 (1973). "According to a more expansive view, however, 'other developments' should refer to any subsequent development, whether or not uniquely program related, which would, in the administrator's mind, call for the making of savings through reduced program expenditure. A determination that a subsequent situation of inflation justified program reduction or termination in order to cut government spending would fit into this category." Note, The Likely Law of Executive Impoundment, 59 Iowa L.Rev. 50, 67 (1973). Most commentators, however, lean to the narrow view. *See* 86 Harv.L.Rev. 1517; 59 Iowa L.Rev. 67; 82 Yale L.J. 1642.

Mr. Fisher in an article quoted in the Impoundment Hearings, p. 399, takes this narrow view of the application of the Act. In support he quotes from the language of House Appropriations Committee in reporting the Act:

"It is perfectly justifiable and proper for all possible economies to be effected and savings to be made. But there is no warrant or justification for the thwarting of a major policy of Congress by the impounding of funds."

16. Section 701, 5 U.S.C.

that the [legislative] act of committing a matter to an agency's discretion forecloses court consideration of an alleged abuse of that discretion" under any circumstances. To that argument, the Court in *Overseas* replied firmly, "The Legislative History of the Administrative Procedure Act belies this position."[17] And this conclusion in *Overseas* was confirmed in Citizens to Preserve Overton Park v. Volpe (1971) 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed. 2d 136, where, speaking of this exception, the Court characterized it as "a very narrow exception", whose application, according to "The legislative history of the Administrative Procedure Act" is limited to "those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" In resolving whether the matter falls within that "rare" instance in which the executive action is non-reviewable, the problem is "that of determining when the agency action is 'committed to agency discretion' within the meaning of section 10 of the Administrative Procedure Act, and when it merely 'involves' discretion which is nevertheless reviewable." Ferry v. Udall (9th Cir. 1964) 336 F.2d 706, 711, cert. denied 381 U.S. 904, 85 S.Ct. 1449, 14 L.Ed.2d 286. Unquestionably, whether an agency, in exercising its asserted discretionary power under a legislative authorization, is acting in a manner consistent with the legislative purpose and with proper regard for the constitutional principle of separation of powers between the executive and legislative is an issue that Section 10 did not intend to make non-reviewable; it patently is not an issue "committed to agency discretion". *See,* Note, Protecting the Fisc: Executive Impoundment and Congressional Power, 82 Yale L.J. 1636, at p. 1647; DeVito v. Shultz (D.C.D.C.1969) 300 F.Supp. 381, 383; Hamel v. Nelson (D.C.Cal.1963) 226 F.Supp. 96, 98. The power to spend rests primarily with Congress under the Constitution;[18] the executive, on the other hand, has the constitutional duty to execute the law in accordance with the legislative purpose so expressed.[19] When the executive exercises its responsibility under appropriation legislation in such a manner as to frustrate the Congressional purpose, either by absolute refusal to spend or by a withholding of so substantial an amount of the appropriation as to make impossible the attainment of the legislative goals,[20] the executive trespasses beyond the range of its legal discretion and presents an issue of constitutional dimensions which is obviously open to judicial review. And it was this issue and this issue alone to which the District Court carefully restricted itself in this case. It specifically denied any power

17. 385 F.2d at 316, 317, n. 14.

18. Article I, Section 9, Clause 7, Constitution.

19. Article II, Section 3, Constitution.
    *See,* also, Spaulding v. Douglas Aircraft Co. (D.C.Cal.1945) 60 F.Supp. 985, 988, aff., 9th Cir., 154 F.2d 419:
    "The purpose of the appropriations, the terms and conditions under which said appropriations were made, is a matter solely in the hands of Congress and it is the plain and explicit duty of the executive branch of the government to comply with the same."

20. See statement of then Assistant Attorney General Rehnquist, quoted in the Impoundment Hearings, at 609:
    " 'It is in our view extremely difficult to formulate a constitutional theory to justify a refusal by the President to comply with a Congressional directive to spend. It may be argued that the spending of money is inherently an executive function, but the execution of any law is, by definition, an executive function, and it seems an anomalous proposition that because the Executive Branch is bound to execute the laws, it is free to decline to execute them.' Memorandum Re Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools (Dec. 1, 1969), reprinted in Impoundment Hearings at 279, 283."

It may be said, too, that, by absolutely refusing to spend or obligate funds appropriated by Congress, the executive is for all practical purposes exercising an "item veto", terminating or delaying a particular program, thereby avoiding the embarrassment of a public veto message with the risk of a Congressional overriding.

on its part to review or supervise the defendant's discretion so far as it was exercised in a manner that was not so arbitrary or drastic as to represent a nullification of legislative purpose.[21] We agree generally with this construction of its power by the District Court.[22]

Our only difficulty with the decision of the District Court relates to its conclusion on the issue of arbitrary frustration of legislative policy by the executive action taken. The District Court found that an allotment under Section 205 in the amount of 45% of the authorization under Section 207, established such a drastic and arbitrary administrative reduction in the contract authorization as, on its face, without any other evidentiary support, to require a finding of executive nullification of the purposes of the Act. With this factual finding, we are unable to agree. The statement of the President must be read in conjunction with the explanation given by the Administrator both in his presentation to this Court and in his Congressional appearances, for his allotments as made. In his presentation to this Court, the Administrator has disclaimed any purpose of evading the responsibilities given him under the Act. In his appearance before the Senate *ad hoc* Subcommittee on Impoundment of Funds on February 6, 1973,[23] where he defended the allotments made for the

years in question here, he forcefully expressed his commitment to the goals intended by the Act [24] and affirmed that the reductions in the contract authorizations, as represented by the allotments made by him under Section 205 for fiscal years 1973 and 1974, were arrived at on the basis of an administrative judgment that greater authorizations could not be spent "in a wise or expeditious manner" [25] in achieving such goals during those years. This judgment was based, in turn, he testified, on a conclusion that "there was not sufficient technical capacity, technical capability, I think it was, or contractual capacity" to carry out a greater or more extensive program.[26] In reaching that conclusion, he had taken note, according to his testimony, that there were already available other contract authorizations for the same purposes as that authorized under the Act, which, when added to the authorizations actually allotted by the Administrator, meant that "there was $7.25 billion released on the 27th of November [1973] to be spent over the next 18 months" in meeting the goals of the program.[27] He argued that to attempt a more rapid rate of spending would inordinately inflate the cost of the program without appreciably accelerating the attainment of its goals. He pointed out in partial confirmation of this opinion that "the construction industry has inflated

21. *Cf.*, Housing Auth., San Francisco v. United States Dept., H.U.D. (D.C.Cal.1972) 340 F.Supp. 654, 656; Church, The Impoundment of Appropriated Funds: The Decline of Congressional Control Over Executive Discretion, 22 Stan.L.Rev. 1240, 1252 (1970); Boggs, Executive Impoundment of Congressionally Appropriated Funds, 24 U. of Fla.L.Rev. 221, 228 (1972); and Stassen, Separation of Powers and the Uncommon Defense: The Case Against Impounding of Weapons System Appropriations, 57 Geo.L. J. 1159, 1201 (1969); and Miller, Presidential Power to Impound Appropriated Funds: An Exercise in Constitutional Decision-Making, 43 N.C.L.Rev. 502, 536 (1965).

The court's power is well stated in 82 Yale L.J. at p. 1651:

"The court need not seek to derive some lower figure but need simply test the contested impoundment against the legislative

intent as expressed in the act to determine whether the impoundment was an abuse of discretion. It will derive its own construction of the statute, then test the administrative action to see whether it could rationally be a carrying out of the Act's mandate."

22. Of course, in the exercise of his discretion, the Administrator may not consider factors that are irrelevant to the legislative intent. *Overton Park, supra* (401 U.S. at 416, 91 S.Ct. 814.)

23. Impoundment Hearings, at 403, et seq.

24. *Ibid*, p. 405.

25. *Ibid*, p. 413.

26. *Ibid*, p. 416.

27. *Ibid*, p. 416.

the cost of the building of the project at the rate of 120 percent", while at the same time "the cost of living has gone up at the rate of 40 percent." [28]

The Administrator, also, asserted in his brief, without contradiction by the plaintiff, that as of August 31, 1973, all of the States had utilized but 73 percent of their 1973 allotments and 8 percent of their 1974 allotments. There is no way for us at this juncture to venture an opinion whether the Administrator had been "dragging his feet" in approving projects or whether these figures indicate that the allotments made represented reasonable goals for the two fiscal years in controversy. The experience in the use of the allotments so far in fiscal 1973 and 1974 is, though, a matter that might well be considered in determining whether the Administrator, in exercising his discretion under Section 205, acted so arbitrarily as to frustrate the attainment of the legislative goals.

Moreover, it must not be overlooked that the Administrator claims the power to increase allotments during a fiscal year and has declared in this Court that, should it appear that the allotments made for fiscal years 1973 and 1974 are not sufficient to support the applications made and qualifying under the standards established, he will give consideration to making additional allotments out of the maximum authorizations provided by Section 207.[29] The Act itself grants contract authorizations for the fiscal years 1973–1974–1975 in the overall amount of $18 billion. It provides for reallotment of unused allotments. The defendant asserts that, considered as a whole, the Act gives the defendant the power to add to allotments for any fiscal year, within, of course, the legislative maximums, as the need demonstrates. Because he claims there has been no denial of any qualified project in either fiscal year 1973 or fiscal year 1974, there is no demonstrable need for an increase in the allotments heretofore made. Moreover, he avers without contradiction by the plaintiff that no qualified project for the Commonwealth of Virginia has been denied contract authorization during fiscal 1973 or 1974. He goes further and asserts that if there are qualifying projects from Virginia in the fiscal years in question that exceed the allotments already made, the plaintiff has suffered no prejudice or injury unless he [the Administrator] refuses to make additional allotments to cover qualifying projects in Virginia in the two fiscal years in question. It is true, as the plaintiff argues, that Section 205 declares that allotments are to be made no "later than the January 1st immediately preceding the beginning of the fiscal year for which authorized" but the defendant presses the point that this provision simply establishes a date for initial allotments and was not intended and

---

28. *Ibid*, pp. 416–417.

In connection with this latter statement of the Administrator, it may be observed that one of the disputed issues in some of the controversies over executive impoundments concerns whether there is legislative warrant under the particular legislation for the executive to consider the need to thwart general inflationary tendencies in the economy in determining a withholding of appropriations. The claimed basis for the exercise of such power is stated by the Department of Justice in its reply to certain questions propounded by the Chairman in the Impoundment Hearings, pp. 837–8. it is not clear whether this issue is present here. It is possible to interpret the testimony of the Administrator as indicating that it was the unique, inflationary forces prevalent at the moment in that part of the construction industry involved in sewage plant development which were considered by him. Actually, however, the general objection to impoundment on the part of the Congress seems to be directed at the re-ordering of priorities as a result of impoundment. Thus, the Chairman of the Subcommittee at the Impoundment Hearings, Senator Erwin, after quoting from Mr. Fisher to the effect that, "Impoundment is not being used to avoid deficiencies, or to effect savings, or even to fight inflation, but rather to shift the scale of priorities from one Administrator to the next, prior to Congressional action," said, "That is our complaint." Impoundment Hearings, p. 277.

29. This procedure, if followed, it could be argued, would carry out the Congressional intent.

does not represent a restriction on the defendant's right, if the need develops, to add to or to increase the allotments as initially made.[30] Whether this construction is sound—and we are strongly persuaded that it is—it would seem unlikely that any party would have standing successfully to challenge any increase made by the Administrator in the initial allotment. In any event, this is an issue that should be given consideration in determining whether the action of the Administrator was arbitrary.

These observations do not establish that the District Court's conclusion was incorrect; they do indicate, though, that the issue in controversy here is not one to be resolved by any *per se* rule but is one that requires inquiry into the basis for the Administrator's action. After all, there is a presumption of legality that attaches ordinarily to an administrator's action and the burden of establishing impropriety rests on him who challenges. Even if the District Court had concluded, as some other courts have, that the Administrator was without discretion in making allotments under Section 205, he would still have been empowered under the terms of the Antideficiency Act "to withhold funds for reasons of efficiency and economy"; and, if the plaintiff wished to challenge an impounding of funds made under the authorization of the Antideficiency Act, it would have had the burden of showing "that the impoundment was in fact not warranted by efficiencies or other new developments", and *pari passu*, it would seem to follow that "a plaintiff challenging an assertion that the executive has discretion to impound under a particular spending bill must show that the dis-

cretion granted was less than that claimed". Note, Impoundment of Funds, 86 Harv.L.Rev. 1505, 1529 (1973). Beyond the bare assumption that an expenditure of approximately half the authorized appropriation establishes a frustration of legislative purpose the plaintiff has done nothing to satisfy its burden. Such an assumption, in the face of other circumstances to which we have adverted, and recognizing that the District Court has found at least some discretion in the Administrator to fix the allotment, is insufficient to support the conclusion reached by the District Court that the allotments made were "a violation of the spirit, intent and letter of the Act and a flagrant abuse of executive discretion", or involved a use of irrelevant factors in arriving at his action. That issue should not have been resolved on the pleadings but a record should have been made that would support the conclusion reached by the District Court.[31] We accordingly remand to the District Court for further proceedings in order to determine, on the basis of such evidence as may be submitted by the parties, whether as a fact the amount of allotments made by the Administrator under Section 205 were "a violation of the spirit, intent and letter of the Act and a flagrant abuse of executive discretion", or involved irrelevant or improper standards in fixing such amount. In connection with that inquiry, it will be appropriate for the District Court to consider whether the factors used by the defendant in fixing the allotments were the ones that were "relevant" under a proper construction of the discretionary power found to exist in the executive.[32]

Remanded with directions.

**30.** *See,* Impoundment Hearings, pp. 840–1.

**31.** *Cf.,* State of Minnesota v. United States Environmental Protection Agency (D.C. Minn.1973) (decided June 25, 1973), in which the plaintiff, complaining, as the plaintiff does here, that the allotments were improper as they applied to it, offered in af-fidavit form, proof that projects in its state had qualified for grant but were being denied approval because of the paucity of the allotment.

**32.** *See,* Citizens to Preserve Overton Park v. Volpe, *supra,* at 420 of 401 U.S., 91 S.Ct. 814.